**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN (COLUMBUS) DIVISION**

Brian Garrett,
Edward Gonzales,
Kent Kilgore,
Adam Plouse, and
John Does 1-35, individually and
on behalf of all others similarly situated,

       Plaintiffs,

vs.

The Ohio State University,

       Defendant.

Civil Case 2:18-cv-00692-MHW-EPD

**JURY TRIAL DEMANDED**

---

**<u>FIRST AMENDED CLASS ACTION COMPLAINT</u>**

1.  The Ohio State University is a preeminent undergraduate and graduate research university and a perennial athletic powerhouse.

2.  Today, in 2018,[1] Ohio State's Strategic Plan vows that:



What Ohio State does matters. And how we do it matters….
We owe it to our students, our faculty, our staff and to our community. We owe it to ourselves. And, because we are Ohio State, we owe it to the nation.

3.  Plaintiffs file this lawsuit in the hope that Ohio State will make good on that promise. Ohio State is right: now is the "time" for "change."

4.  To make a change, Ohio State must take responsibility for a dark chapter in its storied history, a chapter during which its doctor and assistant professor, Dr. Richard Strauss, sexually assaulted, battered, molested, and/or harassed potentially thousands of its students.

5.  For **forty years**—from 1978 until it undertook an investigation in 2018—the University has been deliberately indifferent to the safety of its student body by, as detailed in this complaint, by failing to investigate the many complaints of Dr. Strauss's

---

[1] The Ohio State University, Office of the President, https://president.osu.edu/strategicplan/ (last visited July 16, 2018).

misconduct and harassment. Had it met its obligation to do so—an obligation that is not only social and moral, but also legal—the assault, molestation, and suffering of the Plaintiffs herein would have been prevented.

6.       Dr. Strauss was employed by Defendant Ohio State University ("OSU" or "Ohio State") to provide medical care and treatment to OSU's students and student-athletes for twenty years. OSU made him an assistant professor of medicine and the official sports team doctor. OSU also employed Dr. Strauss to serve as a physician at OSU's Student Health Services.

7.       As a sports team doctor and assistant professor, Dr. Strauss was clothed in the authority and legitimacy of Ohio State. He was not only a medical doctor—he was Ohio State's official medical doctor.

8.       Dr. Strauss used his position of trust and confidence to regularly and systematically sexually assault, abuse, batter, molest, and harass male students and student-athletes over the entire course of his career in his capacity as an employee, agent, and/or representative of Ohio State.

9.       Despite being repeatedly informed of Dr. Strauss's sexual assault, abuse, battery, molestation, and/or harassment, Ohio State failed to take appropriate action (or, in fact, any action whatsoever) to stop Dr. Strauss, to change the sexually hostile culture on campus, or to ensure the safety of its male students.

10.      These failures have continued. In the twenty years since Dr. Strauss's tenure at OSU ended, OSU has taken no action to change the culture of indifference that

allowed Dr. Strauss to assault OSU students for decades.

## JURISDICTION AND VENUE

11.    Plaintiffs incorporate by reference the allegations contained in the previous paragraphs.

12.    This action is brought pursuant to Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*, as more fully set forth herein.

13.    This Court has subject matter jurisdiction over this action under numerous statutes, including 28 U.S.C. § 1331 (federal question jurisdiction).

14.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because the events giving rise to Plaintiffs' claims arose in this judicial district.

## PARTIES

15.    Plaintiffs incorporate by reference the allegations contained in the previous paragraphs.

16.    Plaintiff Brian Garrett is a resident of the State of Ohio.

17.    Brian graduated from OSU with a Bachelor of Science in Nursing degree in 1996. He attended the graduate nursing program (nurse practitioner major) at OSU in 1997 and 1998. He completed his Master of Science in Nursing degree at the University of Cincinnati (switched majors to nurse anesthesia as OSU did not offer this major) in 2003. He is currently employed as a Certified Registered Nurse Anesthetist.

18.    Brian was sexually assaulted, battered, molested, and/or harassed by Dr. Strauss at an off-campus health clinic in 1996.

Page 3

19.     Brian's abuse would never have occurred had OSU taken appropriate action to investigate and address the multiple prior reports and complaints of Dr. Strauss's sexual abuse.

20.     Between approximately 1991 and 1995, OSU allowed Dr. Strauss to see student patients at the on-campus student health center. There, he had access to the entire student population, not just student athletes.

21.     OSU removed Dr. Strauss from the student health center during the 1995 – 1996 school year after receiving a complaint from a student, although Dr. Strauss continued to be employed by OSU as an assistant professor and a varsity athletics physician until 1998.

22.     Shortly after being ousted from the student health center, Dr. Strauss set up shop in a nondescript, three-story office building less than two miles from campus. There, he opened "Men's Clinics of America," a men's health clinic that offered "Prompt Treatment of Common Genital/Urinary Problems."



23.

An advertisement that ran in *The Lantern*
on multiple occasions during the Fall 1996 semester.

24.     Despite the name, Men's Clinics of America was only one clinic, and it had only one doctor—Richard Strauss.

25.     "Men's Clinics of America" was not even the real name of the business; Dr. Strauss ran the clinic through a corporation he formed in 1996, Richard H. Strauss, M.D., Inc.

26.     OSU would have discovered all of this had it vetted the ad in its campus paper from unnamed "experienced doctors" offering discounted sexual health services to its students. But OSU didn't do that.

27.     OSU was oblivious to these red flags—a doctor removed from his position in light of complaints of sexual abuse against him, opening his own clinic to treat "common genital/urinary problems."

28.     Instead, OSU allowed Dr. Strauss to solicit its male students for sexual health treatment in its student newspaper.

29.     This was the perilous situation in which Brian found himself in 1996. In the spring of that year, another nursing student told Brian that a university doctor was opening an off-campus men's health clinic and was hiring male nursing students to staff the clinic as office staff (not nursing staff). The doctor was recruiting students on campus at Larkins Hall, and Brian agreed to meet with the doctor. The doctor was Richard Strauss.

30.     Brian did not know Dr. Strauss and had never heard of his reputation among student student-athletes. He met Dr. Strauss for the first time in an interview on campus in the spring of 1996.

31.     Dr. Strauss offered Brian the opportunity to gain experience in a medical

office and a recommendation from a highly-credentialed doctor, which Brian hoped would help get him with his application to OSU's graduate nursing program. Dr. Strauss also offered decent pay, at least for a broke college kid. So Brian took the job.

32.     At the clinic, OSU athletes were given priority and seen on a walk-in (unscheduled) basis. For OSU athletes, there were no intake charts completed per Dr. Strauss's request, and while Dr. Strauss saw other patients with the office staff, he saw OSU athletes alone.

33.     Brian began working for Dr. Strauss in the fall of 1996. On his third or fourth day working in the clinic, Dr. Strauss summoned Brian into the examination room while a male patient was lying supine on the examination bed. Dr. Strauss was standing over the patient. Dr. Strauss instructed Brian to stand in the corner of the room.

34.     Dr. Strauss removed the patient's pants and began to heavily fondle the patient's penis and testicles until the patient achieved an erection. The patient's face turned bright red; Brian presumes the patient was embarrassed.

35.     Dr. Strauss then instructed Brian to come closer. He did not explain why Brian needed to be closer to the patient.

36.     Dr. Strauss continued to fondle the patient until the patient ejaculated. Brian was shocked by what he witnessed. Dr. Strauss then instructed Brian to exit the exam room to retrieve tissues so that Dr. Strauss could clean up the ejaculation.

37.     When Brian subsequently asked Dr. Strauss about what happened, Dr. Strauss replied that he was "testing for premature ejaculation."

38.     Brian recalls feeling uneasy about the incident, but, given the nature of the

clinic and his own limited medical experience at the time, he did not recognize that it was inappropriate.

39.     Later that same day, Dr. Strauss asked Brian if he had any ailments.  Brian complained to Dr. Strauss that he was experiencing severe heartburn. Dr. Strauss offered to examine and treat Brian.

40.     Dr. Strauss had Brian lie down on the examination table and began touching and pressing on Brian's abdomen while asking him questions about any pain he was experiencing. Dr. Strauss then unexpectedly removed Brian's pants and began fondling his genitalia. Dr. Strauss explained that he was "just checking for some things."

41.     Brian was in shock. He immediately left the clinic and never returned.

42.     Brian did not report the incident at the time because he believed his experience was an isolated incident and he feared repercussions for his graduate school application and career if he caused problems for a university doctor.

43.     Years later, in late May 2018, Brian was at a Cleveland Indians game when his friend showed him a news article about the allegations that Dr. Strauss had sexually abused student athletes. Upon seeing Dr. Strauss's picture, Brian felt sick to his stomach and wanted to puke.

44.     Since then, Brian has lost countless nights of sleep and, when he does sleep, he often wakes up feeling paralyzed, like he is back on Dr. Strauss's exam table. He has sought counseling, has experienced difficulties pursuing opportunities related to his profession. Despite that he is a medical professional, he now fears his family getting medical treatment.

45.     Brian decided to step forward in 2018 when he learned that he was not alone and that his was not an isolated incident.

46.     Brian is a proud lifelong Buckeye. He holds undergraduate degrees from OSU (along with graduate school coursework), he met his wife there and proposed to her in Ohio Stadium, and he continues to donate his time and money to the university. He wants the university to acknowledge and take responsibility for the role it played in what happened to him and other students.

47.     Like all Plaintiffs herein, Brian was not aware that Dr. Strauss's conduct was not medically necessary and that it was, in fact, sexual assault.

48.     Like all Plaintiffs herein, even if Brian had known that Dr. Strauss's conduct constituted sexual assault, Brian was not informed or made aware of any formal OSU grievance procedure to complain about Dr. Strauss.

49.     Like all Plaintiffs herein, even if Brian had known that Dr. Strauss's conduct constituted sexual assault, he had no reason to know the role that OSU had played in facilitating the abuse: OSU received but ignored or rebuffed or concealed complaints against Strauss, which prevented Brian, like all Plaintiffs, from discovering their claims against OSU.

50.     Due to OSU ignoring and rebuffing and concealing complaints, any investigation by Brian or other Plaintiffs would have been futile.

51.     Like all Plaintiffs herein, until reading news coverage of the OSU investigation in 2018, Brian did not realize the magnitude or scope of Dr. Strauss's abuse of OSU students, or OSU's role in permitting Dr. Strauss's rampant sexual misconduct.

52.     Like all Plaintiffs herein, if OSU had taken meaningful action to address prior reports of Dr. Strauss's sexual abuse, Brian would not have been abused by Dr. Strauss.

53.     Like all Plaintiffs herein, had OSU taken meaningful remedial action once learning of Dr. Strauss's abuse, Brian's damages may have been mitigated.

54.     However, at no time did anyone from OSU ever reach out to Brian regarding Dr. Strauss; no one from OSU has ever apologized to Brian or offered him treatment or counseling for the abuse he suffered as an OSU student at the hands of OSU's doctor.

55.     Like all Plaintiffs herein, Brian still suffers from the pervasive and systematic deprivation of his rights by OSU, which still has not acted to resolve or remediate its institution-wide failures related to Dr. Strauss.

56.     Plaintiff Ed Gonzalez is a resident of Ohio and a former student-athlete on OSU's track team.  Ed was sexually assaulted, battered, molested, and/or harassed by Dr. Strauss during examinations in the 1990s.

57.     When Ed was an incoming freshman, he was directed to Dr. Strauss for a physical.

58.     Dr. Strauss had Ed remove his clothing and Dr. Strauss stared at Ed's testicles, during which time Dr. Strauss put his face very close to Ed's genitals and appeared to be attempting to conceal an erection.

59.     Dr. Strauss then massaged Plaintiff Gonzalez's chest for an inappropriate amount of time and commented that he had "large pecs for a hurdler."

60.     Plaintiff Kent Kilgore is a resident of Florida and a former student athlete on

OSU's swim team. Kent was sexually assaulted, battered, molested, and/or harassed by Dr. Strauss during examinations in the 1980s.

61.     When Kent was an incoming freshman, on partial scholarship for swimming, he was directed to Dr. Strauss for a physical.

62.     Dr. Strauss used no gloves. Dr. Strauss examined his anal region and inserted his finger in Kent's rectum.

63.     Dr. Strauss fondled Kent's genitals and held his penis "in his hand and played with it like playdough."

64.     While at OSU, Kent had two "physicals" by Dr. Strauss, and has not had a physical since.

65.     At the time, he thought that was just what you had to go through to be in a big university.

66.     Plaintiff Adam Plouse is a resident of the state of Ohio, and a former student athlete on OSU's wrestling team. Adam was sexually assaulted, battered, molested, and/or harassed by Dr. Strauss during examinations in the 1990s.

67.     Adam attended OSU from 1995 to 1999. He wrestled for the first three years of his college career.

68.     Beginning his freshman year, he was warned by upperclassmen about Dr. Strauss, and tried to keep his distance.

69.     Nevertheless, when Adam was a freshman, he was directed to Dr. Strauss for a physical where he endured an extensive and inappropriate hernia check.

70.     On many occasions in Larkins Hall, Dr. Strauss watched Adam shower in a way that made Adam uncomfortable.

71.     John Doe 1 is a resident of the State of Ohio and a former student-athlete on OSU's soccer team in the 1990s. John Doe 1 was sexually assaulted, battered, molested, and/or harassed by Dr. Strauss during his time at OSU.

72.     John Doe 2 is a resident of the State of Ohio and attended OSU from 1991 to 1997. John Doe 2 was sexually assaulted, battered, molested, and/or harassed by Dr. Strauss during his time at OSU.

73.     John Doe 3 is a resident of the State of Michigan and was a student-athlete on OSU's varsity hockey team during the late 1980s. John Doe 3 was sexually assaulted, battered, molested, and/or harassed by Dr. Strauss during his time at OSU.

74.     John Doe 4 is a resident of the State of Ohio and is a former student-athlete on OSU's wrestling team. John Doe 4 was sexually assaulted, battered, molested, and/or harassed by Dr. Strauss during his time at OSU.

75.     Plaintiff John Doe 5 is a resident of the state of Ohio and is a former student-athlete on OSU's swimming team. John Doe 5 was sexually assaulted, battered, molested, and/or harassed by Dr. Strauss during his time at OSU.

76.     Plaintiff John Doe 6 is a resident of the State of Ohio and a former student-athlete on OSU's wrestling team. John Doe 6 was sexually assaulted, battered, molested, and/or harassed by Dr. Strauss during his time at OSU.

77.     Plaintiff John Doe 7 is a resident of the State of Ohio and was a student at OSU in the 1990s. John Doe 7 was sexually assaulted, battered, molested, and/or

harassed by Dr. Strauss during his time at OSU.

78.     Plaintiff John Doe 8 is a resident of the State of Ohio and a former student of OSU. He was a student athlete on OSU's wrestling team for one year in the 1980s. John Doe 8 was sexually assaulted, battered, molested, and/or harassed by Dr. Strauss during his time at OSU.

79.     Plaintiff John Doe 9 is a resident of the State of Ohio and a former student-athlete on OSU's volleyball team. John Doe 9 was sexually assaulted, battered, molested, and/or harassed by Dr. Strauss during his time at OSU.

80.     Plaintiff John Doe 10 is a resident of the State of New Jersey and a former student-athlete on OSU's fencing team. John Doe 10 was sexually assaulted, battered, molested, and/or harassed by Dr. Strauss during his time at OSU.

81.     Plaintiff John Doe 11 is a resident of the State of North Carolina and a former student-athlete on OSU's gymnastics team. John Doe 11 was sexually assaulted, battered, molested, and/or harassed by Dr. Strauss during his time at OSU.

82.     Plaintiff John Doe 12 is a resident of the State of Ohio and a former student-athlete on OSU's wrestling team. John Doe 12 was sexually assaulted, battered, molested, and/or harassed by Dr. Strauss during his time at OSU.

83.     Plaintiff John Doe 13 is a resident of the State of Ohio and a former student-athlete on OSU's lacrosse team. John Doe 13 was sexually assaulted, battered, molested, and/or harassed by Dr. Strauss during his time at OSU.

84.     Plaintiff John Doe 14 is a resident of the State of California and a former student at OSU during the late 1970s-early 80s. John Doe 14 was sexually assaulted,

battered, molested, and/or harassed by Dr. Strauss during his time at OSU.

85.     Plaintiff John Doe 15 is a resident of the State of Ohio and a former student-athlete on OSU's volleyball team. John Doe 15 was sexually assaulted, battered, molested, and/or harassed by Dr. Strauss during his time at OSU.

86.     Plaintiff John Doe 16 is a resident of the State of Ohio and a former student at OSU. John Doe 16 was sexually assaulted, battered, molested, and/or harassed by Dr. Strauss during his time at OSU.

87.     Plaintiff John Doe 17 is a resident of the State of Pennsylvania and a former student-athlete on OSU's lacrosse team. John Doe 17 was sexually assaulted, battered, molested, and/or harassed between ten and twenty times by Dr. Strauss during his time at OSU.

88.     Plaintiff John Doe 18 is a resident of the State of Florida and a former student-athlete on OSU's wrestling team in the late 1990s. John Doe 18 was sexually assaulted, battered, molested, and/or harassed by Dr. Strauss during his time at OSU.

89.     Plaintiff John Doe 19 is a resident of the State of Colorado and a former student-athlete on OSU's soccer team in the mid-1980s. John Doe 19 was sexually assaulted, battered, molested, and/or harassed by Dr. Strauss during his time at OSU.

90.     Plaintiff John Doe 20 is a resident of the State of Ohio and a former student-athlete on OSU's wrestling team. John Doe 20 was sexually assaulted, battered, molested, and/or harassed by Dr. Strauss during his time at OSU.

91.     Plaintiff John Doe 21 is a resident of the State of Ohio and a former student-athlete on OSU's soccer team. John Doe 21 was sexually assaulted, battered, molested,

and/or harassed by Dr. Strauss during his time at OSU.

92. Plaintiff John Doe 22 is a resident of the State of Ohio and a former student-athlete with OSU's club soccer team. John Doe 22 was sexually assaulted, battered, molested, and/or harassed by Dr. Strauss during his time at OSU.

93. Plaintiff John Doe 23 is a resident of the State of Texas and a former student-athlete on OSU's track team. John Doe 23 was sexually assaulted, battered, molested, and/or harassed by Dr. Strauss during his time at OSU.

94. Plaintiff John Doe 24 is a resident of the State of Maryland and a former student-athlete on OSU's tennis team. John Doe 24 was sexually assaulted, battered, molested, and/or harassed by Dr. Strauss during his time at OSU.

95. Plaintiff John Doe 25 is a resident of the State of Ohio and a former student-athlete on OSU's soccer team during the early 1990s. John Doe 25 was sexually assaulted, battered, molested, and/or harassed by Dr. Strauss during his time at OSU.

96. Plaintiff John Doe 26 is a resident of the State of Ohio and a former OSU student. John Doe 26 was sexually assaulted, battered, molested, and/or harassed by Dr. Strauss during his time at OSU.

97. Plaintiff John Doe 27 is a resident of the State of Ohio and a former OSU student-athlete on OSU's wrestling team in the 1980s. John Doe 27 was sexually assaulted, battered, molested, and/or harassed by Dr. Strauss during his time at OSU.

98. Plaintiff John Doe 28 is a resident of the State of Ohio and a former OSU student who participated in elective scuba diving at OSU. John Doe 28 was sexually assaulted, battered, molested, and/or harassed by Dr. Strauss during his time at OSU.

99.     Plaintiff John Doe 29 is a resident of the State of California and a former OSU student-athlete on OSU's gymnastics team in the 1980s. John Doe 29 was sexually assaulted, battered, molested, and/or harassed by Dr. Strauss during his time at OSU.

100.     Plaintiff John Doe 30 is a resident of the State of California and a former OSU student-athlete on OSU's lacrosse team in the 1980s. John Doe 30 was sexually assaulted, battered, molested, and/or harassed by Dr. Strauss during his time at OSU.

101.     Plaintiff John Doe 31 is a resident of the State of Ohio and a former OSU student-athlete on OSU's wrestling team in the 1990s. John Doe 31 was sexually assaulted, battered, molested, and/or harassed by Dr. Strauss during his time at OSU.

102.     Plaintiff John Doe 32 is a resident of the State of Florida and a former OSU student-athlete on OSU's diving team in the 1980s. John Doe 32 was sexually assaulted, battered, molested, and/or harassed by Dr. Strauss during his time at OSU.

103.     Plaintiff John Doe 33 is a resident of the State of New York and a former OSU student-athlete on OSU's tennis team in the 1980s. John Doe 33 was sexually assaulted, battered, molested, and/or harassed by Dr. Strauss during his time at OSU.

104.     Plaintiff John Doe 34 is a resident of the State of Colorado and a former OSU student-athlete on OSU's volleyball team in the 1990s. John Doe 34 was sexually assaulted, battered, molested, and/or harassed by Dr. Strauss during his time at OSU.

105.     Plaintiff John Doe 35 is a resident of the State of Ohio and a former OSU student-athlete on OSU's soccer team in the 1990s. John Doe 35 was sexually assaulted, battered, molested, and/or harassed by Dr. Strauss during his time at OSU.

106.     Defendant The Ohio State University ("OSU" or "Ohio State") is and at all

relevant times has been a state-owned and operated public university and institution of higher education organized and existing under laws of the State of Ohio. OSU receives federal financial assistance and is therefore subject to Title IX, 20 U.S.C. § 1681, *et seq.*

107. At all times relevant hereto, Richard Strauss, M.D. was an actual and/or apparent, duly-authorized agent, servant and/or employee of OSU and performed medical services for OSU students-patients as part of his employment.

108. At all times relevant hereto, Defendant Ohio State was complicit and deliberately indifferent to the sexual assault and harassing conduct of Dr. Strauss.

109. At all times relevant hereto, Defendant Ohio State was complicit and deliberately indifferent to reports it received regarding Dr. Strauss's sexually harassing conduct.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

110. Ohio State hired Dr. Strauss in 1978 as an assistant professor of medicine. From 1981 to 1995, Strauss was the University's team doctor and had contact with athletes in baseball, cheerleading, cross country, fencing, football, gymnastics, ice hockey, lacrosse, soccer, swimming, tennis, track, volleyball, and wrestling. He was also a part-time physician with OSU's Student Health Services.

111. Dr. Strauss was a prolific sexual predator—he is estimated to have sexually assaulted, abused, battered, molested, and/or harassed 1,500 to 2,500 male students and student-athletes during his 20-year tenure at Ohio State.

112. This abuse began his very first year of employment at OSU, and he continued fondling, groping, sexually assaulting, and harassing OSU's male students and

student-athletes until his retirement in 1998. He did so with OSU's knowledge and support.

113.    OSU played a key role in normalizing and perpetuating Dr. Strauss's serial sexual abuse.

114.    OSU facilitated his abuse by requiring that student-athletes undergo annual physical exams with Dr. Strauss in order to participate in OSU athletics and maintain their scholarships.

115.    His notoriously hands-on examinations earned him different nicknames over the years, including "Dr. Jelly Paws," "Dr. Drop-Your-Drawers," "Dr. Nuts," and "Dr. Cough."

116.    These were nicknames well-known by OSU coaching staff, trainers, and student athletes.

117.    In 1993, one wrestler recalls being at one of his earliest practices with the team, where he was told that a physical would be required and was directed to Dr. Strauss. He was warned by upperclassmen who joked, "watch out - he's going to play with you." At the physical, Dr. Strauss engaged in fondling and close inspection of his genitals for an extended amount of time.

118.    For decades, Dr. Strauss was a fixture in the locker rooms, showers, and saunas of Larkins Hall, the former student and faculty recreation center on the Ohio State campus that housed the wrestling, gymnastics, and swimming teams.

119.    A former OSU wrestling coach described Larkins Hall as "a cesspool of deviancy," saying "Coaching my athletes in Larkins Hall was one of the most difficult

things I ever did."[2]

120.    Student athletes were regularly harassed in Larkins Hall by sexually aggressive men who attended the university or worked there:

> The voyeurs would masturbate while watching the wrestlers shower or sit in the sauna, or engage in sexual acts in the areas where the athletes trained, the former wrestlers said.
> …
> The situation was so egregious that former wrestling head coach Russ Hellickson would at times have to physically drag the gawkers out of the building, several sources familiar with his actions at the time said. Hellickson pleaded with the university multiple times to move their athletes to a private facility, the sources said….[3]

121.    Student athletes also pleaded with the University administration to make changes to Larkins Hall to protect student athletes.

122.    During the 1994-1995 season, two wrestlers met with then-Athletic Director Andy Geiger ("AD Geiger") in his office. The wrestlers complained about the voyeuristic and lewd conduct of the men in the lockers and saunas of Larkins Hall. They specifically complained of Dr. Strauss's conduct.

123.    They presented AD Geiger with drawings of changes to the wrestling and gymnastics locker room that they believed would enhance safety and privacy for student athletes.

124.    AD Geiger promised to look into doing something about the situation.

---

[2] Rachael Bade and John Bresnahan, *'A cesspool of deviancy': New claims of voyeurism test Jordan denials*, POLITICO, (July 6, 2018), https://www.politico.com/story/2018/07/06/jim-jordan-harassment-ohio-state-wrestling-699192. (last visited July 16, 2018).

[3] *Id.*

125.     But Ohio State did nothing.

126.     It did not move the athletes to a private facility, as Coach Hellickson requested.

127.     And it did not make the changes the wrestlers suggested.

128.     Only one thing changed: the locker room carpet was cleaned.

129.     Ohio State demolished Larkins Hall in 2005, the same year Dr. Strauss took his own life.

130.     Dr. Strauss thrived at Larkins Hall. Like many sexual predators, once he selected his prey, he took steps to groom them for abuse.

131.     Dr. Strauss would shower with athletes after workouts at the Larkins facility, and had his locker in the students' locker room.

132.     Dr. Strauss generally showered multiple times daily—a shower with each team—where he would wash himself while staring at the showering athletes.

133.     On many occasions, Dr. Strauss would postpone performing medical treatments after practice so that he could shower with the wrestling team.

134.     Dr. Strauss also scheduled his showers so that he could view his favorite athletes naked.

135.     In one instance, Dr. Strauss had just finished showering, had dressed, and was leaving the locker room. As Dr. Strauss was exiting the locker room, one of his favorite wrestlers entered and prepared to shower. Dr. Strauss immediately undid his tie, returned to his locker, undressed, and joined the athlete in the shower, his second shower in a matter of minutes.

136.    Dr. Strauss once moved his locker to be next to the locker of one of his favorite wrestlers, who, accordingly to another former wrestler, looked like an "Abercrombie & Fitch model."

137.    Dr. Strauss took his harassment a step further behind the closed door of his on-campus examination room.

138.    Ohio State required student athletes to undergo physical examinations by Dr. Strauss at least once per season, and sometimes more often.

139.    During these required examinations, Dr. Strauss forced male student athletes to undress from the waist down and submit to invasive and medically unnecessary examinations, during which he would touch and fondle their genitalia and digitally penetrate their anuses, often telling the athletes that he was checking for hernias.

140.    There was no medical necessity for Dr. Strauss's examination, touching, and fondling of male student athletes' genitalia or digital anal penetration during the required periodic physical examinations—Dr. Strauss did it for his own personal, sexual gratification.

141.    One former athlete describes how Dr. Strauss was in charge of checking for hernias during training camp, and would conduct physicals in a private room. During the examination, Dr. Strauss sat on a stool directly in front of the athlete, with his head at about the height of his penis. Dr. Strauss required the athlete to completely remove his shorts and underwear. After completing the hernia check, Dr. Strauss kept him standing there for an uncomfortable period of time.

142.    Dr. Strauss then asked, "How was your summer?" to which the student responded "It was very good, thank you."  Then, using his entire hand, Dr. Strauss took the student's penis and lifted it up towards his belly button, inspecting his scrotum. During this time, he placed his hands on the student's testicles several times as well. In this athlete's opinion, Dr. Strauss was trying stimulate him sexually. After approximately 5-10 minutes had passed, Dr. Strauss replied "It couldn't have been too good, because I don't see any diseases anywhere."  The student laughed nervously because he was unsure how to respond to this comment, which made him very, very uncomfortable. Dr. Strauss then released his penis and said "everything is fine." This student believes that the examination ended because Dr. Strauss was not able to arouse him sexually.

143.    The athlete, along with a teammate, reported Dr. Strauss's conduct then-assistant athletic trainer (later Director of Athletic Training) Bill Davis, who expressed concern. But OSU did nothing.

144.    Another former athlete described the first time he was examined by Dr. Strauss in the fall of 1994: "I'm sitting, and he straddled my thigh, mounted my thigh. Rubbed on my thigh. I was just frozen," the athlete said.[4]

145.    Dr. Strauss then asked the athlete to get naked so Dr. Strauss could check for a sports hernia. The athlete said Strauss proceeded to "inspect my penis in detail" for a significant amount of time.[5]

---

[4] Kevin Stankiewicz, *Former Ohio State athlete says he was sexually assaulted twice by former team doctor Richard Strauss*, THE LANTERN (April 6, 2018), https://www.thelantern.com/2018/04/former-ohio-state-athlete-says-he-was-sexually-assaulted-twice-by-former-team-doctor-richard-strauss/ (last visited July 16, 2018).
[5] *Id.*

146.    Dr. Strauss gave the athlete a physical again the next year. It lasted about 20 minutes, 15 minutes of which involved Dr. Strauss closely inspecting his genitalia.[6]

147.    The athlete remembers being concerned at the time, but alarms were raised the next year when another doctor gave the athlete a physical. It lasted only five minutes.

The athlete recalls thinking at the time, "No hernia test, didn't get naked. Is that it?"

"Then I was like, 'Holy moly,'" the athlete said.

"I was always afraid. [Strauss] was the leading doctor on steroid use in the world, and I was always like, he could always say that medically there's some reason that he needs to spend 15 minutes on my penis," the athlete said. "He could have said that, and he's dead now, but that's what always scared me. But now I'm like, that's crazy. Especially when that other doctor came in in five minutes and checked me out."[7]

148.    As the former athlete explained, he felt powerless to stop Strauss's abuse:

"Someone had to make that decision [to let Strauss continue conducting physicals]," the athlete said. "Let's say he's a great doctor, fine. He doesn't have to do the physicals, because it's like someone was pretty much feeding us to him. I didn't have a choice to say, 'I want somebody else to do my physical' because I didn't feel like I had any power in that position."[8]

149.    Indeed, Ohio State fed its students and student-athletes to Dr. Strauss; these students were particularly vulnerable to abuse.

150.    Many of the student-athletes depended on athletic scholarships to attend Ohio State, scholarships which were contingent on playing by the school's rules, including the requirement to undergo physical examinations by Dr. Strauss.

---

[6] *Id.*
[7] *Id.*
[8] *Id.*

151. One athlete asked if he could get his mandatory yearly physical exam elsewhere, but was told he had to see Dr. Strauss. These were the longest exams he had ever experienced, and always included a "hernia check."

152. But Dr. Strauss did not confine his abuse to the periodic physical examinations required by Ohio State.

153. Ohio State allowed Dr. Strauss to treat student-athletes for sports injuries and everything else—from heartburn to sprained ankles.

154. Regardless of the ailment, Dr. Strauss's treatment of male student athletes almost always included examination, touching, and fondling of their genitalia, and it frequently included digital anal penetration.

155. A former OSU gymnast, and Plaintiff herein, specifically recalls any time he saw Dr. for a medical issue, whether it was an annual physical, a broken bone, or an ear infection, he was required to disrobe and endure an extended and uncomfortable examination of his lower body.

156. A former wrestler recalls Dr. Strauss approaching him in Larkins Hall and suggesting that, if he would come to the health center, Dr. Strauss could write him a prescription for acne. When he did so, Dr. Strauss had him disrobe and lay down on the examination table. Dr. Strauss inspected and fondled the athlete for five minutes, trying to bring him to an erection. When he was unsuccessful, he wrote the prescription for acne medication and the student left.

157. Some athletes saw it as the price of getting treatment.

158. Ohio State forced student athletes to make a chilling decision: either seek

treatment from Dr. Strauss and submit to his molestation or forego treatment and live with illness or injury.

159.    Athletes had to receive physicals before competing, whether or not they were injured, which meant that systematic sexual abuse from Dr. Strauss was inevitable under the Devil's bargain Ohio State forced them to make with themselves.

160.    With their collegiate athletic careers and scholarships on the line, many athletes sought treatment from Dr. Strauss for their physical conditions, at a high cost to their mental and emotional health.

161.    OSU also permitted Dr. Strauss to treat nonathletes at OSU's Student Health Services campus health clinic until complaints led OSU to relegate Dr. Strauss to serving only its athletic teams.

162.    One Plaintiff went to the campus health clinic with what he believed was strep throat. Dr. Strauss required him to disrobe, and ultimately fondled him to erection and ejaculation. The student had to remind Dr. Strauss to do the strep swab before leaving.

163.    One Plaintiff saw Dr. Strauss at the OSU health center in the 1990s for burning with urination. Dr. Strauss digitally penetrated his anus, under the guise of checking his prostate, and commented "Don't worry, this sometimes makes guys ejaculate." On a follow-up visit, Dr. Strauss fondled the student to ejaculation. This student did not see a doctor for the rest of his college career, or for many many years after.

164.    One Plaintiff remembers seeing Dr. Strauss twice at the health clinic: on both occasions, Dr. Strauss insisted on a very thorough genital examination and digitally

penetrated his anus. Dr. Strauss told the man it was usual and customary to get an erection during the exam, and not to worry if he did.

165.    Dr. Strauss's abuse—which OSU allowed to continue unchecked throughout his long tenure—traumatized many victims for decades. Indeed, some victims continue to be afraid to see doctors to this day, causing them to neglect their health and to receive dangerous diagnoses late.

166.    OSU knew or should have known from the beginning that Strauss was a sexual predator. In 1978—Dr. Strauss's first year at Ohio State—Dr. Strauss fondled a former wrestling team captain during an exam. The wrestler left the exam and went to the Ohio State student health center where he complained about Dr. Strauss's fondling to another doctor.

167.    The doctor told the wrestler that the exam he described was "not normal." But the doctor did nothing. Ohio State did nothing.

168.    Complaints continued to pour in over the years, including to track and field coach Frank Zubovich, tennis coach John Daly,[9]  then-assistant athletic trainer (later Director of Athletic Training) Bill Davis, Director of OSU Student Health Services, Ted Grace, M.D., and Athletic Director Andy Geiger.

169.    The years passed, the complaints of disturbing and graphic sexual assault by Dr. Strauss multiplied, and no one took any corrective action. Nor did OSU.

170.    In 1993, another former OSU wrestler complained about Dr. Strauss to

---

[9] https://www.npr.org/2018/08/13/638306947/former-ohio-state-students-report-decades-of-sexual-misconduct-by-university-phy. (last visited August 14, 2018).

former head wrestling coach Russ Hellickson after being groped during three exams. The wrestler said that Coach Hellickson told Dr. Strauss to stop such behavior.

171.    Coach Hellickson told Dr. Strauss that some of the athletes were "uncomfortable" with him showering with them, to which the doctor responded that Hellickson also showered with the athletes. Hellickson responded: "Not for an hour, Doc."[10]

172.    Coach Hellickson also complained to Dr. Strauss about touching his athletes: "I said 'When you're doing weigh-ins, you're too hands on, Doc,'" Hellickson said.[11]

173.    As the complaints against Dr. Strauss mounted,[12] OSU eventually held a hearing on Dr. Strauss in or around the spring of 1997.[13]

174.    But OSU took no legal or disciplinary action against Dr. Strauss as a result of the hearing.

175.    Dr. Strauss quietly retired from his positions at OSU after the hearing.

176.    In fact, upon his retirement, he was made an Emeritus Professor: In a

---

[10] Eliza Collins, *Ex-OSU coach defends Jordan in abuse scandal but says team doctor made athletes 'uncomfortable'*, USA TODAY (July 10, 2018), https://www.usatoday.com/story/news/politics/2018/07/10/trump-conservatives-sticking-jordan-over-abuse-allegations-but-others/769402002/. (last visited July 16, 2018).

[11] *Id.*

[12] Andrew Welsh-Huggins, *List grows of people said to know of Ohio St. doctor's abuse*, https://www.usnews.com/news/us/articles/2018-08-11/list-grows-of-officials-said-to-know-of-ex-doctors-abuse (last visited October 25, 2018).

[13] Kevin Stankiewicz, *Former Ohio State athlete says he was sexually assaulted twice by former team doctor Richard Strauss*, THE LANTERN (April 6, 2018), https://www.thelantern.com/2018/04/former-ohio-state-athlete-says-he-was-sexually-assaulted-twice-by-former-team-doctor-richard-strauss/. (last visited July 16, 2018).

memo announcing his retirement, OSU officials proclaimed, "Dr. Strauss has become a national and international renowned expert in the field of sports medicine through his outstanding teaching, service and research."

177. OSU made these statements despite its knowledge that Dr. Strauss had perpetuated sexual abuse on thousands of innocent students.

178. And this distinguished legacy followed Dr. Strauss for the next 20 years, until in 2018 a group of athletes came forward publicly and shared their stories of abuse and of OSU's failure to respond.

179. Unfortunately, OSU has fostered a culture of institutional indifference to the rights and safety of its students: Dr. Strauss is not the only OSU employee who has used his position to abuse students, although he may be the most prolific abuser.

180. This continuing culture of indifference has been noted by the U.S. Department of Education's Office of Civil Rights, in multiple lawsuits against the University, and in the media.

181. In June of 2010, the United States Department of Education's Office of Civil Rights ("OCR") began an investigation into OSU regarding its policies and procedures enacted to protect and respond to victims of sexual assault and abuse on campus.

182. Only after the investigation began and OCR issued a 2011 Dear Colleague letter on sexual violence did OSU scramble to revise its sexual abuse policies and

procedures.[14]

183.   To close the review, OSU entered into a resolution agreement with OCR.[15]

184.   After OCR initiated its investigation, OSU internally investigated a sexual harassment complaint against its marching band, which resulted in the dismissal of its director, Jonathan Waters, for fostering a "culture of intimidation." The investigation found that OSU had notice of the hostile environment but had failed to do anything about it.

185.   Upon completion of the overarching OCR investigation, which spanned more than four years, OCR made findings that OSU violated Title IX.

186.   OCR mandated *inter alia* that "Once a [Title IX] recipient knows or reasonably should know of possible sexual harassment, it must take immediate and appropriate action to investigate or otherwise determine what occurred."[16]

187.   In July of 2014, OSU President Michael Drake pledged "Nothing is more important than the safety of our students. We expect every member of our community to live up to a common standard of decency and mutual respect and to adhere to university policies."[17]

188.   Coincidentally, just days later, in August of 2014, during a diving meet,

---

[14] *See* Letter from Meena Morey Chandra, Regional Director, Reg. XV, Office for Civil Rights, U.S. Dep't Educ., to Dr. Michael V. Drake, President, Ohio State University, 2 (Sept. 11, 2014) (describing results of OSU's investigation of alleged sexual harassment within Marching Band), https://www2.ed.gov/documents/press-releases/ohio-state-letter.pdf (last visited August 14, 2018) (hereinafter "OCR Findings Letter").

[15] Resolution Agreement, Ohio State University, OCR Docket #15-10-6002, accessible at https://www2.ed.gov/documents/press-releases/ohio-state-agreement.pdf (last visited July 24, 2018).

[16] Letter from Meena Morey Chandra, Regional Director, OCR, to Dr. Michael Drake, President of OSU (September 11, 2014)

[17] *Id.*

Ohio State received a report that OSU assistant diving coach Will Bohonyi was sexually abusing a minor member of OSU's Diving Club. Inexplicably, OSU allegedly sent the victim—not the perpetrator—home from the meet.

189.     OSU then failed to take action to address the hundreds of naked photographs of the underage victim engaged in sexual acts that Coach Bohonyi had forced her to take. These photographs—child pornography—have sat in OSU's possession for some four years.

190.     Despite its pledge and resolution agreement in response to the 2010-2014 OCR investigation, OSU continued to foster a culture of indifference and has demonstrably failed to show it was working to protect survivors of sexual violence.

191.     OSU has continued to respond inappropriately and unreasonably to reports of sexual violence.

192.     OSU's inaction and pattern of deliberate indifference has been exhibited by the University at least since 1978, the year that Strauss was hired and first abused a student.

193.     This pattern of deliberate indifference persisted through Dr. Strauss's long career at OSU, despite notice to appropriate people, including multiple head coaches, the future Director of Athletic Training, Director of Student Health, and an Athletic Director, who could have and should have taken action.

194.     This pattern of deliberate indifference continued beyond Dr. Strauss's retirement, as evidenced by numerous, persistent reports and allegations of sexual abuse and misconduct across campus that were not properly addressed by the University and permitted the creation of a campus condition rife with sexual assault.

195.     Any policies or procedures in place at OSU during Dr. Strauss's tenure were clearly ineffective and inadequate and essentially served no purpose in protecting students.

196.     Ohio State's delay and deliberate indifference has created a hostile environment for its male students, particularly its male athletes.

197.     Case in point: it has been four years since OSU was specifically put on notice by the Department of Education that its culture fostered a sexually hostile environment for students, and yet no action has been taken to remedy the abuse suffered by its students, including the victims of Dr. Richard Strauss.

198.     In April 2018, twenty years after Dr. Strauss's retirement, and forty years after the first complaint of abuse, OSU opened an investigation into complaints against Strauss made directly to OSU by student athletes dating back to the late 1970s.

199.     OSU only began the investigation in an effort to protect its brand, after multiple former students came forward with their stories of abuse by Dr. Strauss, and these stories were publicized in the media.

200.     To date, investigators have completed interviews with more than 200 former students and staff, including over 100 former students who report firsthand accounts of sexual abuse and harassment.

201.     Although many of Dr. Strauss's victims, including the Plaintiffs in this case, felt that his exams were medically inappropriate and deeply uncomfortable, many of them did not realize these exams constituted illegal sexual abuse and harassment until after OSU publicized its investigation this year.

202.     Nor did they realize the magnitude or scope of Dr. Strauss's abuse of OSU

students or OSU's role in permitting Dr. Strauss's rampant sexual misconduct.

203.    And many of Strauss's victims, including the Plaintiffs in this case, were revictimized by the opening of this investigation in April 2018, having compartmentalized and repressed their memories of abuse for many years.

204.    They have been further revictimized in recounting the horrific details of their abuse to the "independent" investigators OSU is paying to finally look into Dr. Strauss's legacy.

205.    The Perkins Coie investigators are no more than a team of lawyers, paid by OSU to canvas victims and frame the extent of OSU's potential liability.

206.    No detailed written statements are taken, and the victims are not provided their written statements for feedback, correction, or follow-up.

207.    The "investigation" is not professionally done: victims are not given the choice of male or female interviewers for this sensitive information. The lead investigators are white collar defense investigators, and there is no indication that they are trained in trauma-informed interviewing or counseling.

208.    The female interviewers who have talked with Plaintiffs and others are not specially trained or certified for interviewing sex abuse victims; for example, one is an e-discovery/document review attorney at Perkins Coie.

209.    The "investigation" is not to change the culture at OSU: The victims who are reaching out to speak with Perkins Coie are not asked about how the OSU system could be fixed to prevent what happened for decades.

210.    The "investigation" is not to accept responsibility for what happened: OSU

has not marshalled resources to provide treatment for the victims, never once offering to cover or provide treatment.

211. OSU has not insisted that its insurers provide coverage or help in any way.

212. OSU has rejected Plaintiffs' invitation to mediate, has moved to deny discovery, and has filed motion to dismiss telling the victims to go away.

213. Upon being presented with detailed and credible evidence of Strauss's sexual abuse and the institutional ineptitude in its response, Ohio State still refuses to take accountability.

214. In the more than six months since the investigation began, no findings have been made about OSU's inadequate handling of complaints against Dr. Strauss, despite countless hours of victim interviews, in which OSU's alumni recount the specific, lurid details of their college experience.

215. In the more than six months since the investigation began, OSU has taken no action to remedy or resolve the failures that led to OSU's deliberate indifference to abuse by its employees.

216. OSU knows who the team members of the various sports were from 1978-2004, and who the male patients in its Clinic were from 1978-2004, but has done nothing to identify where they are now, and contact them—claiming instead it does not want to "re-traumatize" them by bringing up the past. This implies OSU knows it is likely that every male athlete was abused, that the abuse itself was painful, that they have repressed it for decades, and that coping with it will be painful even now.

217. OSU has made it clear since 1978: It doesn't want to know what happened

to Plaintiffs or other alumni who were victimized by Richard Strauss.

218. OSU doesn't want to be held accountable for employing a serial, sexual predator, allowing him to abuse students for years, and then failing to take any remedial action to help these students.

219. If OSU had taken meaningful action to address prior reports of Dr. Strauss's sexual abuse forty years ago, Plaintiffs would not have been abused by Dr. Strauss.

220. Since the allegations became public in early 2018 and OSU opened its investigation, OSU now has ample notice of Dr. Strauss's abuse of its students, including Plaintiffs herein, and yet it has taken no affirmative action to change or improve upon the culture of indifference or help the victims.

221. OSU's actions and inactions had the systematic effect of depriving Plaintiffs herein and countless other students of the educational benefits afforded to them through their enrollment in the University.

222. This pattern of failing to protect students and allowing sexual assault to perpetuate and continue effectively remains today at OSU.

223. In May of 2018, the University announced it had conducted an independent review of its Sexual Civility and Empowerment unit ("SCE"), an on-campus entity enacted to support victims of sexual assault.[18]

224. The findings of this external review indicated that the SCE had failed to

---

[18] Zach Varda and Michael Lee, *Ohio State shuts down its Sexual Civility and Empowerment unit*, The Lantern, June 19, 2018, https://www.thelantern.com/2018/06/ohio-state-shutting-down-sexual-civility-and-empowerment-unit/. (last visited August 29, 2018)

properly document and report pertinent information regarding sexual assault complaints made by students.[19]

225. The Ohio Health Sexual Assault Response Network of Central Ohio made deeply disturbing findings regarding the response by university employees at the SCE to victims of sexual abuse. [20]

226. Among the findings made were that "Survivors were subjected to victim-blaming, unethical and re-traumatizing treatment by SCE advocates. Some victims were told they were lying or delusional, suffered from mental illness, had an active imagination, didn't understand their own experience or fabricated their story."

227. In a statement by the University following the findings made regarding SCE, OSU claimed it is working toward improvement: "Ohio State will do all that we can to be a national leader in preventing and responding to sexual misconduct," Ohio State University President Michael Drake said in a statement. "Our campuses must be safe places for all members of our community to learn, work and grow. We remain steadfastly and unwaveringly committed to this goal."[21] But this statement is belied by OSU's conduct: Forty years after Richard Strauss began sexual assaulting students under the guise of practicing medicine, OSU has continued to fail to enact or implement meaningful change or programs to protect victims.

---

[19] *Id.*

[20] Jennifer Smola, *Ohio State closes sexual-assault center, fires 4 after complaints,* The Columbus Dispatch, June 19, 2018. http://www.dispatch.com/news/20180619/ohio-state-closes-sexual-assault-center-fires-4-after-complaints (last visited September 23, 2018)

[21] *Id.*

228.     OSU's efforts to protect its own image at the expense of students is starting to unravel.

229.     In August 2018, the Office for Civil Rights announced it would *again* be launching an investigation into OSU's compliance with Title IX, to inquire whether the University responds promptly and equitably to complaints and reports of sexual misconduct by former students.[22]

230.     Ohio State University's continued indifference and resulting inaction to sexual abuse allegations against Strauss is wanton, willful and with reckless disregard and neglect of Plaintiffs' rights, safety and wellbeing.

231.     OSU has displayed and continues to display deliberate indifference to the suffering of its students. It perpetuated a sexually hostile environment and a culture of deliberate indifference by ignoring widespread and repeated complaints of Dr. Strauss's conduct. Its pre-assault failures resulted in additional harm to Plaintiffs. Had OSU responded appropriately and reasonably to complaints, assault could have been avoided. Instead, it concealed and rebuffed reports, which prevented Plaintiffs from discovering their claims.

232.     OSU encouraged an attitude of deliberate indifference—sweeping away allegations of abuse, at best, and outright ignoring these allegations at worst—all in the name of protecting the University's supposed integrity and coaxing more and more student-

---

[22] Dakin Andone, *Ohio State University faces federal investigation into alleged sexual misconduct by school doctor,* August 17, 2018, https://www.cnn.com/2018/08/17/us/ohio-state-university-federal-investigation/index.html (last visited October 25, 2018)

athletes to help OSU win championships despite the cruel personal toll.

233.     Only recently could OSU no longer hide behind its self-made veil of secrecy. With the jig finally up, OSU has proclaimed its intent to investigate despite its quiet efforts to kill Plaintiffs' claims along with their spirits.

234.     In this manner, Plaintiffs' claim stems from OSU's deliberate indifference, spawned by Dr. Strauss's barbarism, and OSU's decades-long refusal to own Dr. Strauss's behavior and to make proper amends to his victims. Instead, OSU ignored it, excused, it, and did everything except own up. But still, OSU seeks to evade responsibility. Plaintiffs' amended complaint does not let that happen.

235.     It is time to hold OSU accountable.

236.     Through this lawsuit, Plaintiffs demand that OSU acknowledge its failures, account for the damages these failures have caused, and institute real and meaningful change to ensure that no future OSU students endure such abuse and harassment.

## <u>CLASS ACTION ALLEGATIONS</u>

237.     Plaintiffs bring this action individually and pursuant to Federal Rule of Civil Procedure 23 (b)(3) or (c)(4) on behalf of themselves and the following

"Nationwide Class":

All male students or student-athletes of Ohio State University who (1) were examined by Dr. Richard Strauss at Ohio State University or (2) participated in a varsity athletic sport that utilized the locker rooms, showers, and/or saunas at Larkins Hall at any time between 1978 and 1998. Excluded from the class are (1) individuals who have already filed suit in Case No. 18-cv-736-MHW-EPD as of the date of this Complaint.

238.     The Classes consist of hundreds, if not thousands, of men throughout the

United States, making joinder impracticable, in satisfaction of Fed. R. Civ. P. 23(a)(1). The exact size of the Class and the identities of the individual members are ascertainable through records maintained by the Ohio State.

239. The claims of Plaintiffs are typical of the Classes. The claims of the Plaintiffs and the Classes are based on the same legal theories and arise from the same factual pattern involving the Defendant's misconduct.

240. There are many questions of law and fact common to the claims of Plaintiffs and the Class, and those questions predominate over any questions that may affect only individual Class members within the meaning of Fed. R. Civ. P. 23(a)(2), (b)(3), and (c)(4).

241. Common questions of fact or common questions of law affecting members of the Class include, but are not limited to, the following:

    a. Whether Defendant violated Title IX of 20 U.S.C. §1681?

    b. Whether Defendant displayed deliberate indifference to the sexual abuse, assaults, and discrimination at Ohio State?

    c. Whether Defendant had knowledge or knew that Richard Strauss was engaging in sexual abuse of Ohio State's male students and student-athletes?

    d. Whether Defendant concealed, dismissed, discouraged or rebuffed complaints that, if handled reasonably and timely (and in compliance with Title IX) would have prevented future abuse?

    e. Whether Plaintiffs were damaged by the violations caused by Defendants?

242. Absent a class action, most of the members of the Class would find the cost of litigating their claims to be prohibitive and would have no effective remedy. The class treatment of common questions of law and fact is also superior to multiple

individual actions or piecemeal litigation, particularly as to liability, in that it conserves the resources of the courts and the litigants and promotes the consistency and efficiency of adjudication.

243.     Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs have retained counsel with substantial experience in prosecuting complex litigation and class actions, and who have expertise in prosecuting personal injury, sexual abuse, and civil rights cases on behalf of vulnerable victims.

244.     Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the other Class members, and they have the financial resources and experience in handling sex abuse cases to do so.

245.     Neither Plaintiffs nor their counsel have any interests adverse to those of the other members of the Class.

246.     Plaintiffs and the Class will have personal injury damages that are individualized and that can be managed separately.

## **CLAIM FOR RELIEF**

### **Violation of Title IX, 20 U.S.C. § 1681, *et seq***

247.     Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

248.     Title IX, 20 U.S.C. § 1681(a), states: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance…."

249. Title IX also protects third parties from sexual harassment or violence in a school's education programs and activities.

250. Under Title IX, sexual harassment is any type of unwelcome conduct of a sexual nature and "includes unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature."

251. Plaintiffs are "persons" within the meaning of 20 U.S.C. §1681(a).

252. Defendant OSU receives federal financial assistance and is therefore subject to the provisions of Title IX of the Education Act of 1972, 20 U.S.C. §1681, et seq.

253. As the U.S. Department of Education's Office of Civil Rights has explained, Title IX covers all programs of a school, and extends to sexual harassment and assault by employees, students, and third parties.

254. Dr. Strauss's actions and conduct were carried out in his capacity as a team doctor and assistant medical professor of OSU.

255. Dr. Strauss's sexual assault, battery, molestation, and harassment of Plaintiffs, including the fondling of testicles, fondling and penetration of penises, and nonconsensual digital anal penetration, was sexual discrimination and sexual harassment under Title IX.

256. Pursuant to Title IX, Defendant OSU was obligated and required to investigate all allegations of sexual assault, battery, molestation, and harassment, including allegations that sexual assault, battery, molestation, and harassment has been committed by an employee, student, or third party.

257. Defendant OSU owed Plaintiffs duties under Title IX, which duties included not to engage in and be deliberately indifferent to known sexual assault, battery, molestation, harassment, or any other form of sexual misconduct.

258. An "appropriate person" of OSU, within the meaning of Title IX, including but not limited to, former Athletic Director and Assistant University Vice President Andy Geiger, former head wrestling coach Russell Hellickson, former head tennis coach John Daly, Director of Student Health Ted Grace, M.D., former assistant athletic trainer Bill Davis (later Director of Athletic Training at OSU), current university president Dr. Michael Drake, and other OSU faculty, staff, administrators, executives and officials (over the course of forty years) had actual and/or constructive notice of sexual assault, battery, molestation, and harassment committed by Dr. Strauss and the other sexual predators as described herein this Complaint.

259. Thus, the complaints of sexual abuse at Ohio State involving Dr. Strauss were not left unreported at the level of athletes and assistant coaches. Rather, the rampant sexual abuse and culture of sexual abuse was reported to head coaches of multiple sports, Ohio State administrators and to the head of the Athletic Department. But these officials turned a blind eye to the abuse.

260. Former wrestling head coach, Russell Hellickson, has publicly stated in 2018 that it was widely known that Dr. Strauss was engaging in improper sexual behavior and that he reported this behavior to higher authorities within OSU, but OSU authorities did nothing.

261. OSU has failed and continues to fail to carry out its duties to investigate

and take corrective action, or to make appropriate recommendations, under Title IX following the complaints of sexual assault, as described herein.

262.    Despite the complaints and concerns conveyed by athletes and coaches to Defendant OSU and its agents and/or representatives, as described herein, sexual abuse and misconduct allegations went unaddressed, which violated reporting policies and procedures and Title IX and was done in a manner that displayed deliberate indifference to the sexual misconduct and abuse that was occurring.

263.    The sheer scale of the abuse (involving nonathletes and student athletes from at least 14 sports) multiplied by the years it went on for (nearly 20 years) makes it implausible to suggest that Defendant OSU (through its agents and/or representatives) did not know of the endemic sexual abuse.

264.    OSU acted with deliberate indifference by failing to respond to the allegations of sexual assault, abuse, and molestation in light of the known circumstances, Dr. Strauss's conduct toward male athletes, and the scale of the abuse, which occurred both in private examination rooms and also publicly in the showers and training facilities by Dr. Strauss and the other sexual predators allowed to roam freely within Larkins Hall.

265.    OSU failed to adequately supervise or otherwise ensure Dr. Strauss complied with Title IX and other state and federal laws even though OSU had gained actual knowledge that Dr. Strauss posed a substantial risk of additional sexual abuse of male students and student-athletes.

266.    OSU's deliberate indifference before, during, and after the sexual assault, battery, molestation, and harassment of Plaintiffs was in violation of Title IX, 20 U.S.C.

§ 1681, et seq., and its regulations.

267.   OSU's failure to properly and appropriately investigate and take corrective action for the complaints of Dr. Strauss's and other sexual predators' sexual assault, battery, molestation, and harassment resulted in Plaintiffs being subject to further sexual assault, battery, molestation, harassment, and a sexually hostile environment.

268.   OSU's failure to promptly and appropriately investigate and remedy and respond to the sexual assaults after receiving notice subjected Plaintiffs to further sexual assault, battery, molestation, harassment, and a sexually hostile environment, effectively denying them access to educational opportunities at OSU, including appropriate medical care.

269.   OSU's failure to promptly and appropriately investigate and remedy and respond to the sexual assaults after receiving notice subjects Plaintiffs to harm and suffering today.

270.   OSU has repeatedly failed to offer counseling services to current or former victims of Dr. Strauss, including Plaintiffs.

271.   As a direct and proximate result of the OSU's actions and inactions, Plaintiffs have suffered and continue to suffer pain of mind and body, mental anguish, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self- esteem, disgrace, fright, grief, humiliation, enjoyment of life, were prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life, have sustained and continue to sustain loss of earning and loss of earning capacity, and have incurred and will continue to incur

expenses for medical and psychological treatment, therapy, and counseling.

272.    In subjecting Plaintiffs and the Class members to the wrongful treatment herein described, and through its violations of Title IX, OSU, in its effort to "save face" and avoid bad publicity, acted willfully and maliciously with the intent to harm Plaintiff and the Class members, and in conscious disregard of Plaintiff and the Class members' rights, so as to constitute malice and oppression. Plaintiff and the Class members are therefore entitled to the recovery of punitive damages, in an amount to be determined by the court, against OSU, in a sum to be shown according to proof.

273.    Furthermore, Plaintiffs request the award of attorneys' fees pursuant to 42 U.S.C. § 1988.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully requests that this Court will:

a.    Enter judgment against Defendant in such amounts as will fully and adequately compensate Plaintiffs for the damages they have suffered, in an amount to be determined at trial;

b.    Award Plaintiffs punitive damages against Defendants in an amount to be determined by a jury for Defendant's violations of federal law;

c.    Award Plaintiffs pre-judgment and post-judgment interest;

d.    Award Plaintiffs their actual expenses of litigation, including reasonable attorney's fees;

e.    Appoint Plaintiffs as class representatives;

f.    Appoint Plaintiffs' counsel as counsel for the Class; and

g.      Award Plaintiffs such other and further relief as the Court deems just

and proper.


Respectfully Submitted,

/s/ *Simina Vourlis*
Simina Vourlis,
The Law Office of Simina Vourlis
856 Pullman Way
Columbus, OH 43212
(614) 487-5900
(614) 487-5901 fax
svourlis@vourlislaw.com

Rex A. Sharp
Ryan C. Hudson
Scott B. Goodger
Larkin Walsh
Sarah T. Bradshaw
REX. A. SHARP, P.A.
5301 W. 75th Street
Prairie Village, KS 66208
(913) 901-0505
(913) 901-0419 fax
rsharp@midwest-law.com
rhudson@midwest-law.com
sgoodger@midwest-law.com
lwalsh@midwest-law.com
sbradshaw@midwest-law.com

Robert Allard
CORSIGLIA, MCMAHON AND ALLARD,
LLP
96 North Third Street, Suite 620
San Jose, CA 95112
(408) 289-1417
(408) 289-8127 fax
rallard@cmalaw.net

Jonathan Little
SAEED AND LITTLE, LLP
133 W. Market St. #189
Indianapolis, IN 46204
317-721-9214
jon@sllawfirm.com

Stephen Estey
ESTEY & BOMBERGER LLP
2869 India Street
San Diego, CA 92103
619-295-0035
619-295-0172 fax
steve@estey-bomberger.com

Daniel R. Karon (#0069304)
KARON LLC
700 W. St. Clair Ave., Suite 200
Cleveland, OH 44113
Tel.: 216.622.1851
dkaron@karonllc.com

Joseph Sauder
SAUDER SCHELKOPF LLC
555 Lancaster Avenue
Berwyn, PA 19312
(610) 200-0580
(610) 421-1326
jgs@sstriallawyers.com

***COUNSEL FOR PLAINTIFFS***

## <u>CERTIFICATE OF SERVICE</u>

It is hereby certified that a true and correct copy of the foregoing document was filed and

served, via the Court's CM/ECF system on October 26, 2018, on all counsel of record.


By:     */s/ Simina Vourlis*_____
          Attorney for Plaintiffs