# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN (COLUMBUS) DIVISION

Brian Garrett,
Edward Gonzales,
Kent Kilgore,
Adam Plouse,
John Antognoli,
Roger Beedon,
Daniel Ritchie,
Michael Schyck,
John Shepard, and
John Does 1-2, 4-15, 17, 19,
21-33, and 35, individually and
on behalf of all others similarly situated,

       Plaintiffs,

vs.                                                        Civil Case 2:18-cv-00692-MHW-EPD

The Ohio State University,

       Defendant.

                              **JURY TRIAL DEMANDED**

---

## SECOND AMENDED CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

JURISDICTION AND VENUE ......................................................................................... 6

PARTIES .............................................................................................................................. 7

FACTUAL ALLEGATIONS COMMON TO ALL COUNTS ...................................... 13

I..........OSU Employed a Serial Sexual Predator As Its Sports Team Doctor and Student Health Services Physician and, By Doing Nothing When On Notice About It, Actually Enabled and Empowered the Sexual Predator ......................................................................................... 13

    A.   OSU Fostered a Sexually Hostile Environment in Larkins Hall Locker Room and Showers in Which Strauss Thrived ............................................................................ 14

    B.   OSU Required Sports Physicals During Which Strauss Abused Student Athletes........ 15

    C.   Abuse Not Confined to Annual Physicals – Team Doctor's Treatment for the Common Cold Required Student Athletes to Drop Their Shorts ........................................................ 17

    D.   OSU Gave Strauss Broader Access to the General Student Population by Employing Him at the Campus Health Clinic ............................................................................... 18

    E.   Even Students Volunteering to Assist with OSU's Medical Research Studies Become Victims................................................................................................................... 19

II. ..... Timeline of OSU's Deliberate Indifference to Sexual Abuse of its Students By Its Sports Doctor and Clinic Physician ................................................................................................ 20

    A.   Late 1970s ......................................................................................................... 20

    B.   1980s ................................................................................................................. 20

    C.   1990s ................................................................................................................. 24

    D.   OSU's Continuing Culture of Indifference ......................................................... 40

    E.   2018: Public Outcry Compels OSU to Retain Perkins Coie to Investigate Itself .......... 45

    F.   2019: Perkins Coie Report Released -- Plaintiffs Discover OSU's Deliberate Indifference to the Sexual Assaults by OSU's Predator Physician ...................................... 48

    G.   Following the Release of the Perkins Coie Report, OSU Finally Acts – But Only to Protect Its Brand, Control Public Relations, and Silence Survivors ..................................... 56

    H.   High-Ranking Ohioans Step Up to Call Out OSU's Institutional Failures that Left Students Susceptible to Strauss ................................................................................ 60

CLASS ACTION ALLEGATIONS .................................................................................. 63

CLAIM FOR RELIEF ....................................................................................................... 65

Violation of Title IX, 20 U.S.C. § 1681, *et seq* ......................................................... 65

PRAYER FOR RELIEF..................................................................................................... 70

## **INTRODUCTION**

1.      The Ohio State University is a preeminent undergraduate and graduate research university and a perennial athletic powerhouse.

2.      It's been more than a year and a half since news publicly broke that The Ohio State University employed and harbored a known sexual abuser as a student health services physician and athletics team doctor for nearly two decades.

3.      It's been over a year since The Ohio State University pledged its commitment to uncovering the truth about what Dr. Richard Strauss did to its innocent students, what OSU knew, when it knew it, and what (if anything) OSU did about it.

4.      It's been over a year since OSU's Board of Trustees told survivors that OSU was "not dismissing [them]" and that it was "committed to doing the right thing".[1]

5.      It's been 6 months since the multi-million-dollar Perkins Coie investigation into OSU's involvement in the Strauss scandal publicly revealed for the first time that many OSU employees and officials (called "appropriate persons" under the law) received credible reports that Strauss was sexually assaulting students throughout his career as a university employee and team physician—and silently did nothing

6.      It's been 6 months since Rep. Brett Hillyer introduced legislation that would specifically lift the unfair statute of limitations for this undeniable disaster at OSU.

7.      It's been nearly 3 months since Governor Michael DeWine released the findings

---

[1] It's been ten months since the Court in this case said: "I know the board chairman, Mike Gasser. He's a man of his word. He's told the victims that appeared before the board that, [']rest assured, the board is not dismissing you. We're committed to doing the right thing.['] And the Court intends to see that the right thing is done here."

of an independent task force, which confirmed "Strauss' repeated sexual abuse of his patients went effectively unaddressed for nearly the length of his tenure at Ohio State."[2]

8.     And yet the survivors are still waiting for justice from OSU.

9.     And yet the public and OSU alumni are still waiting for OSU to be accountable for what it did (or failed to do).

10.     While these recent events have uncovered OSU's appalling indifference and institutional failures, they omit graphic details of the sexual abuse that OSU's failures subjected these students to.

11.     Because of OSU's unabated failures and cover-up vis-à-vis Strauss, which began in 1978 and were uncovered only in 2019, OSU's male students were:

a.     Repeatedly rectally raped.

b.     Drugged and sodomized.

c.     Fellated.

d.     Digitally penetrated with ungloved fingers into their anuses.

e.     Fondled during required physicals.

f.     Repeatedly subjected to Strauss grinding his erect penis into them.

g.     Manually masturbated by Strauss, including students who were physically incapacitated.

h.     Repeatedly psychologically tormented by Strauss showering with them, gawking at them, commenting on their penis size and physical appearance and

_____

[2] Ohio Department of Public Safety, *Governor's Working Group on Reviewing the Medical Board's Handling of the Investigation Involving Richard Strauss,* August 30, 2019.

masturbating in their presence.

12. The unchecked sexual abuse of these many men, as young, teenage college students by a university doctor is so horrifying, it shocks the conscience.

13. As disturbing as Strauss's crimes are, OSU's complicity and enabling was a complete betrayal of Plaintiffs, its own students.

14. Despite the fact that OSU and the world now know the truth—that these young men were raped, sodomized, molested, sexually assaulted, mentally and emotionally tortured and otherwise traumatized—justice remains elusive.

15. Dr. Richard Strauss is dead. He can't pay for his crimes.

16. Only his enabler is left, and OSU steadfastly hides behind the statute of limitations—as if OSU's refusal to do the right thing for long enough should wash away its sins.

17. But it was OSU that employed him, that appointed him as official team doctor of numerous sports, that permitted him to examine and treat students unchaperoned and behind closed doors despite reports of sexual abuse, that required students to get "treatment" from him, that failed to take any reasonable steps until 2018 and 2019—40-plus years after it knew the horrible truth.

18. In 2018,[3] and still today, Ohio State's Strategic Plan vows that:

---

[3] The Ohio State University, Office of the President, https://president.osu.edu/strategicplan/ (visited July 16, 2018 and October 1, 2019).



**What Ohio State does matters. And how we do it matters….
We owe it to our students, our faculty, our staff and to our community. We owe it to
ourselves. And, because we are Ohio State, we owe it to the nation.**

19.     Plaintiffs file this lawsuit in the hope that Ohio State will make good on that promise. Ohio State is right: now is the "time" for "change".

20.     To make a change, Ohio State must take responsibility for a dark chapter in its storied history, a chapter during which its doctor and assistant professor, Dr. Richard Strauss, sexually assaulted, battered, molested, and/or harassed thousands of its students.

21.     Despite the scathing 232-page report[4] released by OSU's hired gun investigators, law firm Perkins Coie, which indisputably established that for decades OSU was deliberately indifferent to rampant sexual abuse of students by Strauss (the "Perkins Coie Report"), OSU persists in disclaiming responsibility.

22.     The Perkins Coie Report confirmed: (a) that as far back as 1979, during Strauss's first year of employment, dozens of OSU officials knew he was sexually assaulting male students, and (b) the abuse of all Plaintiffs herein could have been avoided if OSU had promptly taken action against Strauss.

23.     But OSU did nothing. Instead, OSU allowed—or more accurately enabled—a

---

[4] See Funk, Markus and Caryn Trombino, Perkins Coie LLP, *Report of the Independent Investigation, Sexual Abuse Committed by Dr. Richard Strauss at The Ohio State University*, May 15, 2019, (hereinafter "Perkins Coie Report").

prolific sexual predator to remain employed for twenty more years and encouraged or required its students and student-athletes to obtain medical treatment from him.

24.     Upon being presented with the Perkins Coie Report, full of detailed and credible evidence of Strauss's sexual abuse and the institutional ineptitude in its response, Ohio State still refuses to take accountability.

25.     For at least **forty years**—from 1978 until it undertook an investigation in 2018— the University was deliberately indifferent to the safety of its student body by failing to investigate the many complaints of Dr. Strauss's misconduct and harassment, failing to share reports, failing to report to the State Medical Board or to law enforcement, or to restrict or remove Strauss from his position. Had it met its obligation to do so—an obligation that is not only social and moral, but also legal—the assault, molestation, and suffering of the Plaintiffs herein would have been prevented.

26.     Dr. Strauss was employed by Defendant Ohio State University to provide medical care and treatment to OSU's students and student-athletes for twenty years. OSU made him an assistant professor of medicine and the official sports team doctor. OSU also employed Dr. Strauss to serve as a physician at OSU's Student Health Services.

27.     As a sports team doctor and assistant professor, Dr. Strauss was clothed in the authority and legitimacy of Ohio State. He was not just a medical doctor—he was Ohio State's official medical doctor.

28.     Dr. Strauss used his position of trust and confidence to regularly and systematically sexually assault, abuse, batter, molest, and harass male students, student-athletes, non-students as young as 14 invited onto the campus, non-students on OSU sponsored trips off-campus to high schools throughout Ohio, and others over the course of his career in his capacity

as an employee, agent, and/or representative of OSU.

29.     Without OSU's imprimatur, Strauss would not have had access to the OSU male students upon which he preyed.

30.     Despite being repeatedly informed of Dr. Strauss's sexual assault, abuse, battery, molestation, and/or harassment, OSU failed to take appropriate action (or, in fact, any action whatsoever) to prevent, limit, or stop Dr. Strauss, to change the sexually hostile culture on campus, or to ensure the safety of its male students.

31.     These failures have continued. In the twenty years since Dr. Strauss's tenure at OSU ended, OSU has taken no action to change the culture of indifference that allowed Dr. Strauss to assault OSU students for decades.

32.     Even OSU's conduct during the year of this litigation shows its cold-hearted attitude and its refusal to accept responsibility for the largest sex abuse scandal in American history.

## JURISDICTION AND VENUE

33.     Plaintiffs incorporate by reference the allegations contained in the previous paragraphs.

34.     This action is brought pursuant to Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*, as more fully set forth herein.

35.     This Court has subject matter jurisdiction over this action under numerous statutes, including 28 U.S.C. § 1331 (federal question jurisdiction).

36.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because the events giving rise to Plaintiffs' claims arose in this judicial district.

## PARTIES

37.     Plaintiffs incorporate by reference the allegations contained in the previous paragraphs.

38.     Plaintiffs have one common characteristic—every Plaintiff herein is a former OSU student or student-athlete whose life was permanently altered and whose educational benefits were denied by the actions, inactions, and deliberate indifference of OSU.

39.     Every Plaintiff herein was sodomized or molested or penetrated or assaulted or groped or subjected to voyeurism or lewd comments by OSU's Dr. Richard Strauss, and this abuse could have been prevented had OSU timely acted on reports or notice of prior abuse.

40.     Plaintiff Brian Garrett is a resident of the State of Ohio and a former student at OSU. Brian was sexually assaulted, battered, and molested by Dr. Strauss during an examination in 1996.

41.     Plaintiff Ed Gonzalez is a resident of Ohio and a former student-athlete on OSU's track team.  Ed was sexually assaulted, battered, molested, and/or harassed by Dr. Strauss during examinations in the 1990s.

42.     Plaintiff Kent Kilgore is a resident of Florida and a former student athlete on OSU's swim team. Kent was sexually assaulted, battered, molested, and/or harassed by Dr. Strauss during examinations in the 1980s.

43.     Plaintiff Adam Plouse is a resident of the state of Ohio, and a former student athlete on OSU's wrestling team. Adam was sexually assaulted, battered, molested, and/or harassed by Dr. Strauss during examinations in the 1990s.

44.     Plaintiff John Antognoli (formerly John Doe 34) is a resident of the State of Colorado and a former student-athlete on OSU's volleyball team during the 1990s. John was

sexually assaulted, battered, molested, and/or harassed by Dr. Strauss during his time at OSU.

45.     Plaintiff Roger Beedon (formerly John Doe 3) is a resident of the State of Michigan and a former student-athlete on OSU's varsity hockey team during the late 1980s. Roger was sexually assaulted, battered, molested, and/or harassed by Dr. Strauss during his time at OSU.

46.     Plaintiff Dan Ritchie (formerly John Doe 16) is a resident of the State of Ohio and a former student-athlete on OSU's wresting team in the 1990s. Dan was sexually assaulted, battered, molested, and/or harassed by Dr. Strauss during his time at OSU.

47.     Plaintiff Mike Schyck (formerly John Doe 18) is a resident of the State of Florida and a former student-athlete on OSU's wrestling team in the 1990s. Mike was sexually assaulted, battered, molested, and/or harassed by Dr. Strauss during his time at OSU.

48.     Plaintiff John "Hunter" Shepard (formerly John Doe 20) is a resident of the State of Ohio and a former student-athlete on OSU's wrestling team in the 1990s. Hunter was sexually assaulted, battered, molested, and/or harassed by Dr. Strauss during his time at OSU.

49.     Plaintiff John Doe 1 is a resident of the State of Ohio and a former student-athlete on OSU's soccer team in the 1990s.  John Doe 1 was sexually assaulted, battered, molested, and/or harassed by Dr. Strauss during his time at OSU.

50.     Plaintiff John Doe 2 is a resident of the State of Ohio and former student at OSU from 1991 to 1997. John Doe 2 was sexually assaulted, battered, molested, and/or harassed by Dr. Strauss during his time at OSU.

51.     Plaintiff John Doe 4 is a resident of the State of Ohio and is a former student-athlete on OSU's wrestling team. John Doe 4 was sexually assaulted, battered, molested, and/or harassed by Dr. Strauss during his time at OSU.

52.     Plaintiff John Doe 5 is a resident of the state of Ohio and a former student-athlete

on OSU's swimming team. John Doe 5 was sexually assaulted, battered, molested, and/or harassed by Dr. Strauss during his time at OSU.

53. Plaintiff John Doe 6 is a resident of the State of Ohio and a former student-athlete on OSU's wrestling team. John Doe 6 was sexually assaulted, battered, molested, and/or harassed by Dr. Strauss during his time at OSU.

54. Plaintiff John Doe 7 is a resident of the State of Ohio and a former student at OSU in the 1990s. John Doe 7 was sexually assaulted, battered, molested, and/or harassed by Dr. Strauss during his time at OSU.

55. Plaintiff John Doe 8 is a resident of the State of Ohio and a former student of OSU. He was a student athlete on OSU's wrestling team for one year in the 1980s. John Doe 8 was sexually assaulted, battered, molested, and/or harassed by Dr. Strauss during his time at OSU.

56. Plaintiff John Doe 9 is a resident of the State of Ohio and a former student-athlete on OSU's volleyball team. John Doe 9 was sexually assaulted, battered, molested, and/or harassed by Dr. Strauss during his time at OSU.

57. Plaintiff John Doe 10 is a resident of the State of New Jersey and a former student-athlete on OSU's fencing team. John Doe 10 was sexually assaulted, battered, molested, and/or harassed by Dr. Strauss during his time at OSU.

58. Plaintiff John Doe 11 is a resident of the State of North Carolina and a former student-athlete on OSU's gymnastics team. John Doe 11 was sexually assaulted, battered, molested, and/or harassed by Dr. Strauss during his time at OSU.

59. Plaintiff John Doe 12 is a resident of the State of Ohio and a former student-athlete on OSU's wrestling team. John Doe 12 was sexually assaulted, battered, molested, and/or harassed by Dr. Strauss during his time at OSU.

60.     Plaintiff John Doe 13 is a resident of the State of Ohio and a former student-athlete on OSU's lacrosse team. John Doe 13 was sexually assaulted, battered, molested, and/or harassed by Dr. Strauss during his time at OSU.

61.     Plaintiff John Doe 14 is a resident of the State of California and a former student at OSU during the late 1970s-early 80s. John Doe 14 was sexually assaulted, battered, molested, and/or harassed by Dr. Strauss during his time at OSU.

62.     Plaintiff John Doe 15 is a resident of the State of Ohio and a former student-athlete on OSU's volleyball team. John Doe 15 was sexually assaulted, battered, molested, and/or harassed by Dr. Strauss during his time at OSU.

63.     Plaintiff John Doe 17 is a resident of the State of Pennsylvania and a former student-athlete on OSU's lacrosse team. John Doe 17 was sexually assaulted, battered, molested, and/or harassed between ten and twenty times by Dr. Strauss during his time at OSU.

64.     Plaintiff John Doe 19 is a resident of the State of Colorado and a former student-athlete on OSU's soccer team in the mid-1980s. John Doe 19 was sexually assaulted, battered, molested, and/or harassed by Dr. Strauss during his time at OSU.

65.     Plaintiff John Doe 21 is a resident of the State of Ohio and a former student-athlete on OSU's soccer team. John Doe 21 was sexually assaulted, battered, molested, and/or harassed by Dr. Strauss during his time at OSU.

66.     Plaintiff John Doe 22 is a resident of the State of Ohio and a former student-athlete with OSU's club soccer team. John Doe 22 was sexually assaulted, battered, molested, and/or harassed by Dr. Strauss during his time at OSU.

67.     Plaintiff John Doe 23 is a resident of the State of Texas and a former student-athlete on OSU's track team. John Doe 23 was sexually assaulted, battered, molested, and/or

harassed by Dr. Strauss during his time at OSU.

68.     Plaintiff John Doe 24 is a resident of the State of Maryland and a former student-athlete on OSU's tennis team. John Doe 24 was sexually assaulted, battered, molested, and/or harassed by Dr. Strauss during his time at OSU.

69.     Plaintiff John Doe 25 is a resident of the State of Ohio and a former student-athlete on OSU's soccer team during the early 1990s. John Doe 25 was sexually assaulted, battered, molested, and/or harassed by Dr. Strauss during his time at OSU.

70.     Plaintiff John Doe 26 is a resident of the State of Ohio and a former OSU student. John Doe 26 was sexually assaulted, battered, molested, and/or harassed by Dr. Strauss during his time at OSU.

71.     Plaintiff John Doe 27 is a resident of the State of Ohio and a former OSU student-athlete on OSU's wrestling team in the 1980s.  John Doe 27 was sexually assaulted, battered, molested, and/or harassed by Dr. Strauss during his time at OSU.

72.     Plaintiff John Doe 28 is a resident of the State of Ohio and a former OSU student who participated in elective scuba diving at OSU. John Doe 28 was sexually assaulted, battered, molested, and/or harassed by Dr. Strauss during his time at OSU.

73.     Plaintiff John Doe 29 is a resident of the State of California and a former OSU student-athlete on OSU's gymnastics team in the 1980s. John Doe 29 was sexually assaulted, battered, molested, and/or harassed by Dr. Strauss during his time at OSU.

74.     Plaintiff John Doe 30 is a resident of the State of California and a former OSU student-athlete on OSU's lacrosse team in the 1980s. John Doe 30 was sexually assaulted, battered, molested, and/or harassed by Dr. Strauss during his time at OSU.

75.     Plaintiff John Doe 31 is a resident of the State of Ohio and a former OSU student-

athlete on OSU's wrestling team in the 1990s. John Doe 31 was sexually assaulted, battered, molested, and/or harassed by Dr. Strauss during his time at OSU.

76.     Plaintiff John Doe 32 is a resident of the State of Florida and a former OSU student-athlete on OSU's diving team in the 1980s. John Doe 32 was sexually assaulted, battered, molested, and/or harassed by Dr. Strauss during his time at OSU.

77.     Plaintiff John Doe 33 is a resident of the State of New York and a former OSU student-athlete on OSU's tennis team in the 1980s. John Doe 33 was sexually assaulted, battered, molested, and/or harassed by Dr. Strauss during his time at OSU.

78.     Plaintiff John Doe 35 is a resident of the State of Ohio and a former OSU student-athlete on OSU's soccer team in the 1990s. John Doe 35 was sexually assaulted, battered, molested, and/or harassed by Dr. Strauss during his time at OSU.

79.     Defendant The Ohio State University is the biggest and richest University in the Big Ten Conference with an annual budget of $7 billion managed by the Board of Trustees composed of some of the largest and most powerful businesses in Ohio.

80.     Defendant The Ohio State University ("OSU" or "Ohio State") is and at all relevant times has been a state-owned and operated public university and institution of higher education organized and existing under laws of the State of Ohio. OSU receives federal financial assistance and is therefore subject to Title IX, 20 U.S.C. § 1681, *et seq.*

81.     At all times relevant hereto, Richard Strauss, M.D. was an actual and/or apparent, duly authorized agent, servant and/or employee of OSU and performed medical services for OSU student-patients and members of the university community as part of his employment.

82.     At all times relevant hereto, Defendant Ohio State was complicit and deliberately

indifferent to the sexual assault and harassing conduct of Dr. Strauss.

83.     At all times relevant hereto, Defendant Ohio State was complicit and deliberately indifferent to reports it received regarding Dr. Strauss's sexually harassing conduct.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

**I.     OSU Employed a Serial Sexual Predator As Its Sports Team Doctor and Student Health Services Physician and, By Doing Nothing When On Notice About It, Actually Enabled and Empowered the Sexual Predator**

84.     Ohio State hired Dr. Strauss in 1978 as an assistant professor of medicine.

85.     OSU did nothing to ensure that Dr. Strauss was not a sexual predator and established no safeguards for students if he was.

86.     Indeed, OSU never took action to protect students, rather at every opportunity, OSU protected and enabled predator Strauss.

87.     Dr. Strauss was a prolific sexual predator—he is estimated to have sexually assaulted, abused, battered, molested, and/or harassed up to 3,000 male student athletes and others during his 20-year tenure at OSU.[5]

88.     This abuse began his very first year of employment at OSU, and he continued sodomizing, fondling, groping, sexually assaulting, and harassing OSU's male students and student-athletes until he was allowed to retire in 1998.[6] He did so with OSU's knowledge and support—and even earned emeritus status.

89.     The Perkins Report confirmed, "University personnel had knowledge of Strauss'

---

[5] This is based on men's sports team lettermen rosters from 1978-1998, which do not even encompass all athletes who would have been exposed to Dr. Strauss, and the additional student victims at the University Hospital, Student Health Center, and off-campus Men's Clinic.

[6] See infra, Sec, II, describing molestation of the plaintiff representatives herein beginning with Kent Kilgore in 1981, through Brian Garrett in 1996.

sexually abusive treatment of male student-patients as early as 1979".[7]

90.     As highlighted by the Report and the stories that the survivors are now telling, OSU knew or should have known from the beginning that Strauss was a sexual predator.

91.     Over the forty years since OSU hired Strauss, OSU played a key and active role in normalizing and perpetuating Dr. Strauss's serial sexual abuse.

92.     OSU facilitated his abuse by requiring that student-athletes undergo annual physical exams with Dr. Strauss in order to participate in OSU athletics and maintain their scholarships.

93.     His notoriously hands-on examinations earned him different nicknames over the years, including "Dr. Jelly Paws," "Dr. Drop-Your-Drawers," "Dr. Nuts," and "Dr. Cough."

94.     These were nicknames well-known by OSU coaching staff, trainers, and student athletes.

A.  *OSU Fostered a Sexually Hostile Environment in Larkins Hall Locker Room and Showers in Which Strauss Thrived*

95.     Throughout the 80s and 90s, Dr. Strauss was a fixture in the locker rooms, showers, and saunas of Larkins Hall.

96.     Dr. Strauss thrived at Larkins Hall. Like many sexual predators, once he selected his prey, he took steps to groom them for abuse.

97.     Dr. Strauss would shower with athletes after workouts at the Larkins facility, and had his locker in the students' locker room.

98.     Dr. Strauss generally showered multiple times daily—a shower with each team— where he would wash himself while staring at the showering athletes.

---

[7] *Perkins Coie Report of the Independent Investigation*, p. 1.

99.     On many occasions, Dr. Strauss would postpone performing medical treatments after practice so that he could shower with the wrestling team.

100.    Dr. Strauss also scheduled his showers so that he could view his favorite athletes naked.

101.    In one instance, Dr. Strauss had just finished showering, had dressed, and was leaving the locker room. As Dr. Strauss was exiting the locker room, one of his favorite wrestlers entered and prepared to shower. Dr. Strauss immediately undid his tie, returned to his locker, undressed, and joined the athlete in the shower, his second shower in a matter of minutes.

102.    Dr. Strauss once moved his locker to be next to the locker of one of his favorite wrestlers, who, accordingly to another former wrestler, looked like an "Abercrombie & Fitch model."

103.    One victim recounted the extreme emotional and psychological toll that he experienced as a result of seeing Strauss in the showers and locker room every day. He recalled how mentally taxing it was to constantly witness an authority figure nude, gawking at the students and masturbating, and how it would wear on him daily to know that Strauss was waiting every day in the locker room after practice.

104.    Strauss's steadfast presence in the student-athlete showers was known and acknowledged by many OSU employees who could have taken steps to stop it, but didn't.

105.    Ohio State demolished Larkins Hall in 2005, the same year Dr. Strauss took his own life.

### B. OSU Required Sports Physicals During Which Strauss Abused Student Athletes

106.    Dr. Strauss took his harassment a step further behind the closed door of his on-campus examination room.

107.    Ohio State required student athletes to undergo physical examinations by Dr. Strauss at least once per season, and sometimes more often.

108.    During these required examinations, Dr. Strauss forced male student athletes to undress from the waist down and submit to invasive and medically unnecessary examinations, during which he would touch and fondle their genitalia and digitally penetrate their anuses, often telling the athletes that he was checking for hernias.

109.    There was no medical necessity for Dr. Strauss's examination, touching, and fondling of male student athletes' genitalia or digital anal penetration during the required periodic physical examinations—Dr. Strauss did it for his own personal, sexual gratification.

110.    This behavior persisted throughout Strauss's entire tenure at OSU.

111.    One former athlete described the first time he was examined by Dr. Strauss: "I'm sitting, and he straddled my thigh, mounted my thigh. Rubbed on my thigh. I was just frozen," the athlete said.

112.    Dr. Strauss then asked the athlete to get naked so Dr. Strauss could check for a sports hernia. The athlete said Strauss proceeded to "inspect my penis in detail" for a significant amount of time.

113.    Dr. Strauss gave the athlete a physical again the next year. It lasted about 20 minutes, 15 minutes of which involved Dr. Strauss closely inspecting his genitalia.

114.    The athlete remembers being concerned at the time, but alarms were raised the next year when another doctor gave the athlete a physical. It lasted only five minutes.

115.    The athlete recalls thinking at the time, "No hernia test, didn't get naked. Is that it?"

"Then I was like, 'Holy moly,'" the athlete said.

"I was always afraid. [Strauss] was the leading doctor on steroid use in the world, and I was always like, he could always say that medically there's some reason that he needs to spend 15 minutes on my penis," the athlete said. "He could have said that, and he's dead now, but that's what always scared me. But now I'm like, that's crazy. Especially when that other doctor came in in five minutes and checked me out."

116.     As the former athlete explained, he felt powerless to stop Strauss's abuse:

"Someone had to make that decision [to let Strauss continue conducting physicals]," the athlete said. "Let's say he's a great doctor, fine. He doesn't have to do the physicals, because it's like someone was pretty much feeding us to him. I didn't have a choice to say, 'I want somebody else to do my physical' because I didn't feel like I had any power in that position."

117.     Indeed, Ohio State fed its students and student-athletes to Dr. Strauss; these students were particularly vulnerable to abuse.

118.     Many of the student-athletes depended on athletic scholarships to attend Ohio State, scholarships which were contingent on playing by the school's rules, including the requirement to undergo physical examinations by Dr. Strauss.

119.     One athlete asked if he could get his mandatory yearly physical exam elsewhere but was told he had to see Dr. Strauss. These were the longest exams he had ever experienced, and always included a "hernia check."

C. *Abuse Not Confined to Annual Physicals – Team Doctor's Treatment for the Common Cold Required Student Athletes to Drop Their Shorts*

120.     But Dr. Strauss did not confine his abuse to the periodic physical examinations required by Ohio State.

121.     Ohio State allowed Dr. Strauss to treat student-athletes for sports injuries and everything else—from heartburn to sprained ankles.

122.     Regardless of the ailment, Dr. Strauss's treatment of male student athletes almost always included examination, touching, and fondling of their genitalia, and it frequently included digital anal penetration.

123. A former OSU gymnast, and Plaintiff herein, specifically recalls any time he saw Strauss for a medical issue, whether it was an annual physical, a broken bone, or an ear infection, he was required to disrobe and endure an extended and uncomfortable examination of his lower body.

124. A former wrestler recalls Dr. Strauss approaching him in Larkins Hall and suggesting that, if he would come to the health center, Dr. Strauss could write him a prescription for acne. When he did so, Dr. Strauss had him disrobe and lay down on the examination table. Dr. Strauss inspected and fondled the athlete for five minutes, trying to bring him to an erection. When he was unsuccessful, he wrote the prescription for acne medication and the student left.

125. Some athletes saw it as the price of getting treatment.

126. Ohio State forced student athletes to make a chilling decision: either seek treatment from Dr. Strauss and submit to his molestation or forego treatment and live with illness or injury.

127. Athletes had to receive physicals before competing, whether or not they were injured, which meant that systematic sexual abuse from Dr. Strauss was inevitable under the Devil's bargain Ohio State forced them to make with themselves.

128. With their collegiate athletic careers and scholarships on the line, many athletes sought treatment from Dr. Strauss for their physical conditions, at a high cost to their mental and emotional health.

### D. OSU Gave Strauss Broader Access to the General Student Population by Employing Him at the Campus Health Clinic

129. OSU also permitted Dr. Strauss to treat nonathletes at OSU's Student Health Services campus health clinic until complaints led OSU to relegate Dr. Strauss to serving only its athletic teams.

130. One Plaintiff went to the campus health clinic with what he believed was strep throat. Dr. Strauss required him to disrobe, and ultimately fondled him to erection and ejaculation. The student had to remind Dr. Strauss to do the strep swab before leaving.

131. One Plaintiff saw Dr. Strauss at the OSU health center in the 1990s for burning with urination. Dr. Strauss digitally penetrated his anus, under the guise of checking his prostate, and commented "Don't worry, this sometimes makes guys ejaculate." On a follow-up visit, Dr. Strauss fondled the student to ejaculation. This student did not see a doctor for the rest of his college career, or for many many years after.

132. One Plaintiff remembers seeing Dr. Strauss twice at the health clinic: on both occasions, Dr. Strauss insisted on a very thorough genital examination and digitally penetrated his anus. Strauss told the man it was usual and customary to get an erection during the exam, and not to worry if he did.

133. According to a nurse interviewed by Perkins Coie, 1990-1992 OSU student health director Dr. Forrest Smith had notice about Strauss and received reports that Strauss would "show up to the Student Health Center with male students and request access to an examination room" without adhering to "normal scheduling protocols and recordkeeping."   But Smith did nothing.

E. *Even Students Volunteering to Assist with OSU's Medical Research Studies Become Victims*

134. Even students who weren't seeking medical care were victimized. Strauss, along with OSU-tenured Department of Medicine physician Dr. William Malarkey (still a fixture at OSU's Wexner Medical Center) conducted various research studies on students, whom Strauss victimized during the "research."

135. A student-athlete who participated in a research study with Dr. Strauss told Perkins Coie that Strauss would conduct a hernia exam on an "almost daily" basis as part of his

participation in the study.

136.    The only witness to this abuse, Dr. Malarkey, refused to cooperate with Perkins Coie.

## II.   Timeline of OSU's Deliberate Indifference to Sexual Abuse of its Students By Its Sports Doctor and Clinic Physician

### A.  Late 1970s

137.    From 1978 to 1998, Strauss was the University's team doctor and had contact with male athletes in baseball, cheerleading, cross country, fencing, football, gymnastics, ice hockey, lacrosse, soccer, swimming, tennis, track, volleyball, wrestling, and others. He was also a part-time physician with OSU's Student Health Services.

138.    In 1978—Dr. Strauss's first year at Ohio State—Dr. Strauss fondled a former wrestling team captain during an exam. The wrestler left the exam and went to the Ohio State student health center where he complained about Dr. Strauss's fondling to another doctor.

139.    The doctor told the wrestler that the exam he described was "not normal." But the doctor did nothing. Ohio State did nothing.

140.    In 1979, a student trainer reported that OSU personnel in the Athletics Department and Sports Medicine program were aware that Strauss was conducting genital examinations on male athletes that were unusually prolonged, and that Strauss refused to allow athletic training staff to be present for these protracted genital examinations.[8]

### B.  1980s

141.    In 1981, Plaintiff Kent Kilgore was an incoming freshman on partial scholarship for swimming and was directed to Dr. Strauss for a physical.

---

[8] *Id.* at 2.

142. Kent distinctly remembers all the older swimmers clearing the room and literally running away when it was time for physical examinations with Strauss.

143. Kent recalls Strauss immediately instructing him to "drop 'em" as soon as Kent entered the exam room.

144. Dr. Strauss used no gloves. Dr. Strauss examined his anal region and inserted his finger in Kent's rectum.

145. Dr. Strauss fondled Kent's genitals and held his penis "in his hand and played with it like playdough."

146. While at OSU, Kent had two "physicals" by Dr. Strauss.

147. Kent has not had a physical examination since, i.e., for more than 30 years, despite suffering obvious medical symptoms and having medical conditions which require attention.

148. At the time, he thought that was just what you had to go through to be in a big university.

149. Kent quit swimming, quit school, changed his life trajectory and has endured lifelong distrust of authority in the years since.

150. Kent was abused by Strauss in 1981, and he has suffered deep and profound regret that he was unable to do anything to stop Strauss and prevent him from abusing the hundreds of subsequent victims. Kent's wife summed it up perfectly: "We, my family and other families, are living in the harm and malice of OSU's lack of concern toward student safety and Richard Strauss's sexual deviancies toward young, innocent male athletes. We are now paying the price of OSU's indifference to Strauss's predatorial tendencies."

151. In 1981, just three years into his employment with OSU Strauss himself admitted

that be began hearing the swirling of rumors about his proclivities during examinations.[9]

152.    In 1982, OSU's Student Health Center Sports Medicine Clinic Director David Henderson drafted report criticizing the care being administered to student-athletes, stating "Strauss works for no one, answers to no one, and is accountable to no one" and concluding that patient visits had decreased 21% in Strauss's first year. This report was given to Dr. Bob Murphy, the head team physician and Director of Sports Medicine.[10]

153.    In 1983, OSU Fencing Coach Charlotte Remenyik first received reports regarding Strauss when a fencer sought treatment for a foot injury and was forced to "drop his pants."[11]

154.    In 1984, Remenyik said that she received reports from fencers that Strauss was watching them take showers.[12]

155.    In 1986, Dr. Bob Murphy, head team physician, advised Strauss that rumors were persisting throughout the fencing team. Strauss and Murphy agreed that Strauss would avoid treating fencers. Strauss attributed these rumors to Remenyik's "personal and continuous vendetta" against him.[13]

156.    Plaintiff Roger Beedon describes how, when Roger came to play hockey at OSU in the late 1980s, Dr. Strauss was in charge of checking for hernias during training camp and would conduct physicals in a private room. During the examination, Dr. Strauss sat on a stool directly in front of Roger, with his head at about the height of his penis. Dr. Strauss required him to

---

[9] *Id.* at 95.

[10]  *Id. at* 116.

[11] *Governor's Working Group on Reviewing the Medical Board's Handling of the Investigation Involving Richard Strauss* at 50.

[12] *Id.*

[13] *Perkins Coie Report of the Independent Investigation*, p. 95.

completely remove his shorts and underwear. After completing the hernia check, Dr. Strauss kept Roger standing there for an uncomfortable period of time.

157.     Dr. Strauss then asked, "How was your summer?" to which Roger responded, "It was very good, thank you."  Then, using his entire hand, Dr. Strauss took Roger's penis and lifted it up towards his belly button, inspecting his scrotum. During this time, he placed his hands on Roger's testicles several times as well.

158.     In Roger's opinion, Dr. Strauss was trying to stimulate him sexually.

159.     After approximately 5-10 minutes had passed, Dr. Strauss replied "It couldn't have been too good, because I don't see any diseases anywhere."  Roger laughed nervously because he was unsure how to respond to this comment, which made him very, very uncomfortable. Dr. Strauss then released his penis and said "everything is fine." Roger believes that the examination ended because Dr. Strauss was not able to arouse him sexually.

160.     Strauss also isolated Roger on a Sunday at the OSU ice rink and photographed Roger with his shirt off under the guise that Roger's girlfriend and mother would like to receive the photos.

161.     Roger, along with a teammate, reported Dr. Strauss's conduct then-assistant athletic trainer (later Director of Athletic Training) Bill Davis, who expressed concern. But OSU did nothing.

162.     In 1988, Student R and a teammate are questioned by trainer Bill Davis about Strauss's exams in detail. Student R remembered Davis being concerned and thought Strauss would be fired or removed, but nothing ever happened.[14]

163.     Also in 1988, an Assistant Coach corroborated that Student R reported to him

---

[14] *Id*. at 104.

about Strauss and he met with Davis, the team's athletic trainer, as well as the team's head coach to discuss the report. Davis and the head coach decided that Strauss would never see an athlete without a trainer present.[15]

164.     In 1989, another Team Physician recalled that he witnessed a student emerge from an exam and announce to the training room that Strauss had inappropriately examined his genitals. The team physician recalled speaking to the athletic trainer and the trainer reporting this information to Bob Murphy (head team physician) to be investigated.[16]

165.     From the late 1980s to early 1990s, Assistant Athletic Director Larry Romanoff reported Strauss showering with the students to Bob Murphy (head team physician).[17]

*C. 1990s*

166.     In 1991, a Graduate Assistant Trainer reported to Dr. John Lombardo (head team physician) concerns about the rumors regarding Strauss's seemingly unnecessary genital exams and the fact that Strauss insisted on one-on-one exams with the students.[18]

167.     In the early 1990s, Student N personally spoke to Athletic Director Jim Jones and Assistant AD Kate Riffee about the environment for student athletes and Strauss and why Strauss had a locker at Larkins Hall. Student N recalls A.D. Jones being dismissive.[19]

168.     Because his thesis centered around student-athletes and the pressures they faced, this student presented his thesis to Jones and Riffee in conjunction with his inquiries about Strauss.

---

[15] *Id.* at 105.

[16] *Id.* at 101.

[17] *Id.* at 100.

[18] *Id.* at 102.

[19] *Id.* at 90.

He asked why Strauss had a locker in Larkins Hall, which was designated for student-athletes.[20]

169. He remembers Jones being dismissive and not interested to the line of questioning, instructing the student to "move on."[21]

170. Assistant AD Kate Riffee recalled it being "a topic of conversation" among staff members in Athletics that Strauss took long showers at Larkins with students.[22]

171. Plaintiff Ed Gonzalez, a former student-athlete on OSU's track team, was directed to Dr. Strauss for a physical as an incoming freshman at OSU in the early 1990s.

172. Dr. Strauss had Ed remove his clothing and Dr. Strauss stared at Ed's testicles, during which time Dr. Strauss put his face very close to Ed's genitals and appeared to be attempting to conceal an erection.

173. Dr. Strauss then massaged Plaintiff Gonzalez's chest for an inappropriate amount of time and commented that he had "large pecs for a hurdler."

174. Strauss assaulted John Antognoli, a former OSU volleyball player, at least three different times in the 1990s on campus during medical "treatments" and once at Strauss's home, where he invited John under the pretext of viewing athlete photographs Strauss had taken of John. After Strauss showed John the photos, he then proceeded to assault him.

175. Following this assault, John made the realization that he could no longer face Strauss and the sexual abuse that came with being an OSU athlete. John quit the volleyball team at the beginning of his sophomore year and never shared with anyone why he quit the team.

176. As a freshman in 1990, and a member of the Buckeye's wrestling team, Plaintiff

---

[20] *Id.*

[21] *Id.*

[22] *Id.* at 91.

Dan Ritchie was forced to endure physicals by Strauss. Strauss assaulted and groped Dan during the very first physical and the abuse escalated thereafter.

177.    In the fall of 1991, Dan injured his shoulder while home over thanksgiving break. When he returned to school following the holiday, OSU head wrestling coach Russ Hellickson instructed Dan to seek medical attention from Dr. Strauss. Dan initially refused to see Strauss for fear of being assaulted.

178.    At the urging and instruction of Coach Hellickson, Dan finally visited Strauss for treatment of his shoulder. Strauss began the examination by making Dan remove his shirt and then insisted on "examining" Dan's testicles and penis and placed his face near Dan's groin. Dan realized that Strauss was attempting to get him aroused and immediately left the room.

179.    Dan walked away from the team and sport that he loved; he quit wrestling, lost his athletic scholarship, and temporarily dropped out of OSU. Dan never shared why he left the wrestling team with his friends or family and endured a strained relationship with his father because of his decision to leave the team.

180.    Dan finally recognized the abuse and the effects of the abuse after the news broke about Strauss in 2018.

181.    Plaintiff Mike Schyck was a highly touted high school recruit and came to Ohio State in 1990 to fulfill his dream of becoming an Olympic wrestler.

182.    After he arrived on campus as a young freshman, Mike heard upper classman "tease" underclassman about having to undergo physical exams by Dr. Strauss. Immediately upon entering the exam room, Strauss put his face in Mike's groin where he remained for several minutes in his efforts to get Mike aroused.

183.    Mike informed Strauss that he had suffered a groin injury during high school,

which emboldened Strauss to further sexually abuse Mike under the guise of examining his prior injury.

184.     Mike recalls the older wrestlers whistling when he left the exam room as an ode to Strauss's sexual abuse.

185.     Dr. Strauss used a locker just three down from Mike's locker, and further subjected Mike to psychological abuse by repeatedly getting undressed, showering with Mike and the other wrestlers, and subjecting Mike to voyeurism and lewd comments.

186.     Mike, a two-time All-American wrestler at OSU, gave everything of himself—physically and mentally—to the University he loved, and OSU betrayed him.

187.     Mike still suffers with trust issues today because of the damage he endured due to Strauss's actions.

188.     Plaintiff Hunter Shepard loved Ohio State and asked head coach Russ Hellickson if he could have the honor of walking on to OSU's wrestling team.

189.     Hunter recalls being assaulted between 10 and 20 times by Dr. Strauss.

190.     For months on end, Strauss groomed Hunter to garner his trust. He referred to Hunter as his son and called himself Hunter's "second dad."

191.     Due to the fact that Hunter was suffering with a medical condition that required ongoing/periodic attention, he called on Strauss to treat him. Strauss used this as a reason to see Hunter more than other athletes, at his home and office.

192.     Strauss repeatedly sexually abused Hunter during these exams, which he proclaimed were necessary to treat Hunter.

193.     Strauss commented on Hunter's good looks and told Hunter he was an amateur photographer so that he could take photos of Hunter.

194.     Hunter recalls feeling like less than a man for allowing it to happen, but he felt he had "nowhere else to go."

195.     Hunter lived with the shame and guilt of this abuse for decades and never disclosed to anyone what he had endured by Strauss. His despair festered for years and he turned to alcohol and contemplated suicide.

196.     To this day, more than twenty years later, Hunter has not had a physical examination.

197.     In 1993, one wrestler recalls being at one of his earliest practices with the team, where he was told that a physical would be required and was directed to Dr. Strauss. He was warned by upperclassmen who joked, "watch out - he's going to play with you." At the physical, Dr. Strauss engaged in fondling and close inspection of his genitals for an extended amount of time.

198.     In 1993, another former OSU wrestler complained about Dr. Strauss to former head wrestling coach Russ Hellickson after being groped during three exams. The wrestler said that Coach Hellickson told Dr. Strauss to stop such behavior.

199.     Coach Hellickson told Dr. Strauss that some of the athletes were "uncomfortable" with him showering with them, to which the doctor responded that Hellickson also showered with the athletes. Hellickson responded: "Not for an hour, Doc."

200.     Coach Hellickson also complained to Dr. Strauss about touching his athletes: "I said 'When you're doing weigh-ins, you're too hands on, Doc,'" Hellickson said.

201.     In November 1994, Medical Director/Head Team Physician Dr. John Lombardo wrote to Associate Athletic Director Paul Krebs, addressing concerns raised by head fencing coach Remenyik about Strauss.

202.    Coach Remenyik had complained that Strauss was performing improper or unnecessary genital exams on the male fencers. Lombardo reported that the complaints (which he referred to as "pervasive") were unfounded but that the male athletes were not comfortable with Strauss as their physician so Dr. Trent Sickles would be taking over as the fencing doctor.[23]

203.    OSU did not inform Dr. Sickles why he replaced Strauss as the fencing team doctor; OSU deliberately kept him in the dark.

204.    Also in the fall of 1994, two wrestlers met with then-Athletic Director Andy Geiger ("AD Geiger") in his office. The wrestlers complained about the voyeuristic and lewd conduct of the men in the lockers and saunas of Larkins Hall, the former student and faculty recreation center on the Ohio State campus that housed the wrestling, gymnastics, and swimming teams.

205.    A former OSU wrestling coach described Larkins Hall as "a cesspool of deviancy," saying "Coaching my athletes in Larkins Hall was one of the most difficult things I ever did."[24]

206.    Student athletes were regularly harassed in Larkins Hall by sexually aggressive men who attended the university or worked there:

> The voyeurs would masturbate while watching the wrestlers shower or sit in the sauna, or engage in sexual acts in the areas where the athletes trained, the former wrestlers said.
> …
> The situation was so egregious that former wrestling head coach Russ Hellickson would at times have to physically drag the gawkers out of the building, several sources familiar with his actions at the time said. Hellickson pleaded with the university multiple times to move their athletes to a private facility, the sources

---

[23] *Id.* at 94.

[24] Rachael Bade and John Bresnahan, *'A cesspool of deviancy': New claims of voyeurism test Jordan denials*, POLITICO, (July 6, 2018), https://www.politico.com/story/2018/07/06/jim-jordan-harassment-ohio-state-wrestling-699192. (last visited July 16, 2018).

said....[25]

207.    The wrestlers pleaded with the University administration to make changes to Larkins Hall to protect student athletes and specifically complained of Dr. Strauss's conduct. They presented AD Geiger with drawings of changes to the wrestling and gymnastics locker room that they believed would enhance safety and privacy for student athletes.

208.    AD Geiger promised to look into doing something about the situation.

209.    But Ohio State did nothing.

210.    It did not move the athletes to a private facility, as Coach Hellickson requested.

211.    And it did not make the changes the wrestlers suggested.

212.    Only one thing changed: the locker room carpet was cleaned.

213.    Plaintiff Adam Plouse attended OSU from 1995 to 1999. He wrestled for the first three years of his college career.

214.    Beginning his freshman year, he was warned by upperclassmen about Dr. Strauss, and tried to keep his distance.

215.    Nevertheless, when Adam was a freshman, he was directed to Dr. Strauss for a physical where he endured an extensive and inappropriate hernia check.

216.    On many occasions in Larkins Hall, Dr. Strauss watched Adam shower in a way that made Adam uncomfortable.

217.    The Perkins Report confirms that, in January 1995, "Coach A" acknowledged that he personally confronted Strauss about Strauss showering with students and told him he was too hands on. "Coach A" thought he adequately addressed these issues with Strauss.[26]

---

[25] *Id.*

[26] *Perkins Coie Report of the Independent Investigation*, p. 91.

218.    Also in January 1995, two student-patients (Students A and B) from the Student Health Men's Clinic separately reported complaints about Strauss to Student Health administrators.[27]

219.    In January 1996, after Student C reported being molested by Strauss to Dr. Ted Grace, Strauss was quietly placed on administrative leave from Student Health and Athletics.[28] Student C encountered Dr. Strauss in the student health men's clinic in January of 1996 when he sought routine medical treatment for an ailment.

220.    Immediately after Strauss molested him, this student ran out of the exam room and into the waiting room and went berserk in the presence of staff and students. He began to scream and yell and create a scene, demanding his medical records and drawing attention to the inappropriate examination he'd just had.

221.    Dr. Ted Grace was immediately alerted about this incident, the third student complaint about Strauss in just one year.

222.    Shortly thereafter, the student began to receive certified letters from Strauss's attorney, threatening him with legal action if he didn't retract his statements about the assault and alleging that he had "misinterpreted" what had occurred in the exam room. Strauss subsequently suggested that the student had in fact assaulted him, not the other way around.

223.    The trauma of it all wore heavy on the student, who dropped out of OSU, transferred to another school and eventually left the state and moved across the country.

224.    As his mother recalled, they paid OSU for their son's tuition and expenses, which included student healthcare, and in turn, OSU betrayed them, subjecting their son to a serial sexual

---

[27] *Id*. at 114.

[28] *Id.*

abuser and forever changing the trajectory of his life.

225.    By his own admission, Dr. Grace did not inform law enforcement about these reports at Strauss's request.

226.    And although OSU relieved Strauss from his position at OSU's "Men's Clinic," it allowed Strauss to open and advertise to students and provide discounted sexual health services to students at his off-campus medical "Men's Clinic" for two more years, where countless additional students, including Plaintiff Brian Garrett, fell victim to his abuse.

227.    In the weeks following Student C's report, on April 2, 1996, Strauss applied to reserve the corporate name for "Men's Clinic of America" with the Ohio Secretary of State.

228.    Over the spring and summer of 1996, Strauss scoured OSU's campus to recruit students to come work at the Men's Clinic, using his clout as a tenured-professor to lure male nursing students into believing this was a legitimate professional opportunity.

229.    Strauss conducted on-campus interviews in University buildings, where he boasted about his renowned career with OSU and used his status as a tenured professor to garner trust from potential job applicants.

230.    OSU stamped its approval on Strauss and the Men's Clinic by allowing the on-campus recruiting and hiring.

231.    Unbeknownst to the male nursing students Strauss was interviewing—or to any OSU students, OSU's Vice President of Student Affairs, in conjunction with OSU's general counsel, convened a disciplinary hearing against Strauss in June 1996.

232.    In July 1996, the OSU Athletics Department terminated Strauss's employment agreement.

233.    On August 5, 1996, Strauss was informed that his appointment with OSU Student

Health Services was also terminated.

234.    Also in August 1996, the State Medical Board of Ohio began its own investigation of sexual improprieties raised against Strauss.

235.    At no point in time during OSU's investigation or subsequent findings of credible reports of sexual assault of students did OSU ever report Strauss to law enforcement, ban him from campus, or prevent him from interacting with students.

236.    Nevertheless, in August 1996, Dr. Strauss set up shop in a nondescript, three-story office building less than two miles from campus. There, he opened "Men's Clinics of America," a men's health clinic that offered "Prompt Treatment of Common Genital/Urinary Problems."

237.    By September 1996, within a few weeks of Strauss's removal as an OSU physician, his Men's Clinic was up and running, targeted to vulnerable male OSU students, who were suffering from sexually transmitted diseases or urological issues, offering them low-cost or free health care.

238.    Despite the name, Men's Clinics of America was only one clinic, and it had only one doctor—Richard Strauss.

239.    Not only did OSU know Strauss was running the clinic in such close proximity of campus and treating unsuspecting students, but the University gave him its blessing to open the facility.

240.    At least a month before Men's Clinic of America was up and running, "in mid-July 1996, Strauss received assurances from the Associate Vice President of Health Sciences and Academic Affairs that there would be no issue with Strauss engaging in part-time private medical practice while retaining his tenured faculty position at the University. The Associate Vice President was aware, at the time he provided these assurances to Strauss, that Strauss was being

Page 33

investigated by Student Affairs following a complaint brought against Strauss by a student-patient."[29]

241.    Using his name and status as a University-sanctioned tenured professor, Strauss targeted students through his ads in the OSU paper, The Lantern.

242.    Students who sought treatment at Men's Clinic of America likely were not even aware that it wasn't the same OSU sponsored Men's Clinic where they had previously gotten treatment from Strauss.

243.    OSU made no effort to warn students about the dangers of being treated by Strauss or to prevent Strauss from seeking patients who were OSU students.

244.    Instead, OSU allowed Dr. Strauss to solicit its male students for sexual health treatment in its student newspaper.

245.    In fact, in November 1996, OSU's Student Health Director learned that Strauss was operating Men's Clinic of America right near campus, and reported this to the Ohio Medical Board, yet the ads continued to run in the Lantern for at least another 4 months.



246.

An advertisement that ran in The Lantern on multiple occasions during the Fall 1996 semester.

247.    OSU would have discovered all of this had it vetted the ad in its campus paper

---

[29] *Id*. at 5.

from unnamed "experienced doctors" offering discounted sexual health services to its students. But OSU didn't do that.

248.     OSU was oblivious or willfully blind to these red flags—a doctor removed from his position in light of complaints of sexual abuse against him, opening his own clinic to treat "common genital/urinary problems."

249.     Unsuspecting male students had no way of knowing that this clinic was not under OSU's supervision and Strauss operated under the auspice that he was still a University physician, simply functioning in a new location.

250.     OSU took no steps to protect its students or members of the community, naïve to Strauss's employment status with the University, and naïve to Strauss's dangerous propensities. OSU left them vulnerable for sexual abuse because of its failure to publicly admonish or disassociate with Strauss, despite the multiple, credible reports of sexual abuse of patients.

251.     Brian Garrett became one of these unsuspecting victims.

252.     Brian was sexually assaulted, battered, and molested by Dr. Strauss in 1996.

253.     Brian's abuse would never have occurred had OSU taken appropriate action to investigate and address the multiple prior reports and complaints of Dr. Strauss's sexual abuse.

254.     Brian attended OSU between 1992 and 1998, where earned his Bachelor of Science in Nursing degree and did graduate coursework. He completed his Master of Science in Nursing degree at the University of Cincinnati in 2003. He is currently employed as a Certified Registered Nurse Anesthetist.

255.     In the spring of 1996, another nursing student told Brian that a university doctor was moving the Men's Clinic and was hiring male nursing students to staff the clinic. The doctor was recruiting students on campus at Larkins Hall, and Brian agreed to meet with the doctor. The

doctor was Richard Strauss.

256.     Brian did not know Dr. Strauss and had never heard of his reputation among student-athletes. He met Dr. Strauss for the first time in an interview on campus in the spring of 1996.

257.     Dr. Strauss offered Brian the opportunity to gain experience in the Men's Clinic and a recommendation from a highly credentialed doctor. Dr. Strauss also offered decent pay, at least for a broke college kid. So Brian took the job.

258.     At the clinic, OSU athletes were given priority and seen on a walk-in (unscheduled) basis. For OSU athletes, there were no intake charts completed per Dr. Strauss's request, and while Dr. Strauss saw other patients with the office staff, he saw OSU athletes alone.

259.     Brian began working for Dr. Strauss in the fall of 1996. On his third or fourth day working in the clinic, Dr. Strauss summoned Brian into the examination room while a male patient was lying supine on the examination bed. Dr. Strauss was standing over the patient. Dr. Strauss instructed Brian to stand in the corner of the room.

260.     Dr. Strauss removed the patient's pants and began to heavily fondle the patient's penis and testicles until the patient achieved an erection. The patient's face turned bright red; Brian presumes the patient was embarrassed.

261.     Dr. Strauss then instructed Brian to come closer. He did not explain why Brian needed to be closer to the patient.

262.     Dr. Strauss continued to fondle the patient until the patient ejaculated. Brian was shocked by what he witnessed. Dr. Strauss then instructed Brian to exit the exam room to retrieve tissues so that Dr. Strauss could clean up the ejaculation.

263.     When Brian subsequently asked Dr. Strauss about what happened, Dr. Strauss

replied that he was "testing for premature ejaculation."

264.     Brian recalls feeling uneasy about the incident, but, given the nature of the clinic and his own limited medical experience at the time, he did not recognize that it was inappropriate.

265.     Later that same day, Dr. Strauss asked Brian if he had any ailments. Brian admitted to Dr. Strauss that he was experiencing severe heartburn. Dr. Strauss offered to examine and treat Brian.

266.     Dr. Strauss had Brian lie down on the examination table and began touching and pressing on Brian's abdomen while asking him questions about any pain he was experiencing. Dr. Strauss then unexpectedly removed Brian's pants and began fondling his genitalia. Dr. Strauss explained that he was "just checking for some things."

267.     Brian was in shock. He immediately left the clinic and never returned.

268.     Brian did not report the incident at the time because he believed his experience was an isolated incident and he feared repercussions for his OSU graduate school application and career if he caused problems for a university doctor.

269.     Years later, in late May 2018, Brian was at a Cleveland Indians game when his friend showed him a news article about the allegations that Dr. Strauss had sexually abused student athletes. Upon seeing Dr. Strauss's picture, Brian felt sick to his stomach and wanted to puke.

270.     Since then, Brian has lost countless nights of sleep and, when he does sleep, he often wakes up feeling paralyzed, like he is back on Dr. Strauss's exam table. He has sought counseling, has experienced difficulties pursuing opportunities related to his profession. Despite that he is a medical professional, he now fears his family getting medical treatment.

271.     Brian decided to step forward in 2018 when he learned that he was not alone and that his was not an isolated incident.

272.     Brian is a proud lifelong Buckeye. He holds undergraduate degrees from OSU (along with graduate school coursework), he met his wife there and proposed to her in Ohio Stadium, and he continues to donate his time and money to the university. He wants the university to acknowledge and take responsibility for the role it played in what happened to him and other students.

273.     Like all Plaintiffs herein, Brian was not aware that Dr. Strauss's conduct was not medically necessary and that it was, in fact, sexual assault.

274.     Like all Plaintiffs herein, even if Brian had known that Dr. Strauss's conduct constituted sexual assault, Brian was not informed or made aware of any formal OSU grievance procedure to complain about Dr. Strauss.

275.     Like all Plaintiffs herein, even if Brian had known that Dr. Strauss's conduct constituted sexual assault, he had no reason to know the role that OSU had played in facilitating the abuse: that OSU had received but ignored or rebuffed or concealed complaints against Strauss, which prevented Brian, like all Plaintiffs, from discovering their claims against OSU.

276.     Due to OSU ignoring and rebuffing and concealing complaints, any investigation by Brian or other Plaintiffs would have been futile.

277.     Like all Plaintiffs herein, until reading news coverage of the OSU investigation in 2018, Brian did not realize the magnitude or scope of Dr. Strauss's abuse of OSU students, or OSU's role in permitting Dr. Strauss's rampant sexual misconduct.

278.     Like all Plaintiffs herein, if OSU had taken meaningful action to address prior reports of Dr. Strauss's sexual abuse, Brian would not have been abused by Dr. Strauss.

279.     Like all Plaintiffs herein, had OSU taken meaningful remedial action once learning of Dr. Strauss's abuse, Brian's damages may have been mitigated.

280. Like all Plaintiffs herein, Brian still suffers from the pervasive and systematic deprivation of his rights by OSU, which still has not acted to resolve or remediate its institution-wide failures related to Dr. Strauss.

281. Indeed, OSU took no legal or disciplinary action against Dr. Strauss as a result of the summer 1996 hearing. Although Strauss was relieved of his responsibilities as a physician at Student Health Services, his status as a tenured faculty member in the University's School of Public Health remained unchanged.

282. Further, the School of Public Health never initiated or otherwise pursued its own investigation of Strauss.

283. Dr. Strauss quietly retired from his positions at OSU in March of 1998.

284. In a memo announcing his retirement in 1998, OSU officials proclaimed, "Dr. Strauss has become a national and international renowned expert in the field of sports medicine through his outstanding teaching, service and research."

285. Upon his retirement, OSU gilded Strauss's reputation with the title of Emeritus Professor.

286. OSU's actions stand in stark contrast to the knowledge OSU harbored, that Strauss had long been abusing male students.

287. Then OSU Dean of College of Medicine and Public Health, Dr. Bernadine Healy, protested Strauss's emeritus appointment. When a department-wide memo was released announcing Strauss's "retirement" and emeritus appointment, Dean Healy denounced this decision writing that she had not approved this emeritus appointment and that she had not been told about the recommendation.

288. OSU made the recommendation despite its knowledge that Strauss had

perpetuated sexual abuse on thousands of innocent students.

289.    OSU's role in facilitating and covering up Strauss's abuse remained concealed for all these years, and its deliberate indifference has remained the status quo.

### D. OSU's Continuing Culture of Indifference

290.    Unfortunately, OSU has fostered a culture of institutional indifference to the rights and safety of its students: Dr. Strauss is not the only OSU employee who has used his position to abuse students, although he may be the most prolific abuser.

291.    This continuing culture of indifference has been noted by the U.S. Department of Education's Office of Civil Rights, in multiple lawsuits against the University, and in the media.

292.    In June of 2010, the United States Department of Education's Office of Civil Rights ("OCR") began an investigation into OSU regarding its policies and procedures enacted to protect and respond to victims of sexual assault and abuse on campus.

293.    Only after the investigation began and OCR issued a 2011 Dear Colleague letter on sexual violence did OSU scramble to revise its sexual abuse policies and procedures.[30]

294.    To close the review, OSU entered into a resolution agreement with OCR.[31]

295.    After OCR initiated its investigation, OSU internally investigated a sexual harassment complaint against its marching band, which resulted in the dismissal of its director, Jonathan Waters, for fostering a "culture of intimidation." The investigation found that OSU had

---

[30] See Letter from Meena Morey Chandra, Regional Director, Reg. XV, Office for Civil Rights, U.S. Dep't Educ., to Dr. Michael V. Drake, President, Ohio State University, 2 (Sept. 11, 2014) (describing results of OSU's investigation of alleged sexual harassment within Marching Band), https://www2.ed.gov/documents/press-releases/ohio-state-letter.pdf (last visited August 14, 2018) (hereinafter "OCR Findings Letter").

[31] Resolution Agreement, Ohio State University, OCR Docket #15-10-6002, accessible at https://www2.ed.gov/documents/press-releases/ohio-state-agreement.pdf (last visited July 24, 2018).

notice of the hostile environment but had failed to do anything about it.

296.     Upon completion of the overarching OCR investigation, which spanned more than four years, OCR made findings that OSU violated Title IX.

297.     OCR mandated *inter alia* that "Once a [Title IX] recipient knows or reasonably should know of possible sexual harassment, it must take immediate and appropriate action to investigate or otherwise determine what occurred."[32]

298.     In July of 2014, OSU President Michael Drake pledged "Nothing is more important than the safety of our students. We expect every member of our community to live up to a common standard of decency and mutual respect and to adhere to university policies."[33]

299.     Coincidentally, just days later, in August of 2014, during a diving meet, Ohio State received a report that OSU assistant diving coach Will Bohonyi was sexually abusing a minor member of OSU's Diving Club. Inexplicably, OSU allegedly sent the victim—not the perpetrator—home from the meet.

300.     OSU then failed to take action to address the hundreds of naked photographs of the underage victim engaged in sexual acts that Coach Bohonyi had forced her to take. These photographs—child pornography—have sat in OSU's possession for some four years.

301.     Despite its pledge and resolution agreement in response to the 2010-2014 OCR investigation, OSU continued to foster a culture of indifference and has demonstrably failed to show it was working to protect survivors of sexual violence.

302.     OSU has continued to respond inappropriately and unreasonably to reports of sexual violence.

---

[32] Letter from Meena Morey Chandra, Regional Director, OCR, to Dr. Michael Drake, President of OSU (September 11, 2014)

[33] *Id.*

303.     This pattern of failing to protect students and allowing sexual assault to perpetuate and continue effectively remains today at OSU.

304.     In May of 2018, the University announced it had conducted an independent review of its Sexual Civility and Empowerment unit ("SCE"), an on-campus entity enacted to support victims of sexual assault.[34]

305.     The findings of this external review indicated that the SCE had failed to properly document and report pertinent information regarding sexual assault complaints made by students.[35]

306.     The Ohio Health Sexual Assault Response Network of Central Ohio made deeply disturbing findings regarding the response by university employees at the SCE to victims of sexual abuse. [36]

307.     Among the findings made were that "Survivors were subjected to victim-blaming, unethical and re-traumatizing treatment by SCE advocates. Some victims were told they were lying or delusional, suffered from mental illness, had an active imagination, didn't understand their own experience or fabricated their story."

308.     In a statement by the University following the findings made regarding SCE, OSU claimed it is working toward improvement: "Ohio State will do all that we can to be a national leader in preventing and responding to sexual misconduct," Ohio State University President Michael Drake said in a statement. "Our campuses must be safe places for all members of our

---

[34] Zach Varda and Michael Lee, *Ohio State shuts down its Sexual Civility and Empowerment uni*t, The Lantern, June 19, 2018, https://www.thelantern.com/2018/06/ohio-state-shutting-down-sexual-civility-and-empowerment-unit/. (last visited August 29, 2018)

[35] *Id.*

[36] Jennifer Smola, *Ohio State closes sexual-assault center, fires 4 after complaints,* The Columbus Dispatch, June 19, 2018. http://www.dispatch.com/news/20180619/ohio-state-closes-sexual-assault-center-fires-4-after-complaints (last visited September 23, 2018)

community to learn, work and grow. We remain steadfastly and unwaveringly committed to this goal."[37]

309.    But this statement is belied by OSU's conduct: Forty years after Richard Strauss began sexual assaulting students under the guise of practicing medicine, OSU has continued to fail to enact or implement meaningful change or programs to protect victims.

310.    And in August 2018, the Office for Civil Rights announced it would *again* be launching an investigation into OSU's compliance with Title IX, to inquire whether the University responds promptly and equitably to complaints and reports of sexual misconduct by former students.[38]

311.    Ohio State University's continued indifference and resulting inaction to sexual abuse allegations against Strauss is wanton, willful and with reckless disregard and neglect of Plaintiffs' rights, safety and wellbeing.

312.    OSU has displayed and continues to display deliberate indifference to the suffering of its students. It perpetuated a sexually hostile environment and a culture of deliberate indifference by ignoring widespread and repeated complaints of Dr. Strauss's conduct. Its pre-assault failures resulted in additional harm to Plaintiffs. Had OSU responded appropriately and reasonably to complaints, assault could have been avoided. Instead, it concealed and rebuffed reports, which prevented Plaintiffs from discovering their claims.

313.    OSU encouraged an attitude of deliberate indifference—sweeping away allegations of abuse, at best, and outright ignoring these allegations at worst—all in the name of

---

[37] *Id.*

[38] Dakin Andone, *Ohio State University faces federal investigation into alleged sexual misconduct by school doctor,* August 17, 2018, https://www.cnn.com/2018/08/17/us/ohio-state-university-federal-investigation/index.html (last visited October 25, 2018)

protecting the University's supposed integrity and coaxing more and more student-athletes to help OSU win championships despite the cruel personal toll.

314.    OSU's inaction and pattern of deliberate indifference has been exhibited by the University at least since 1978, the year that Strauss was hired and first abused a student.

315.    This pattern of deliberate indifference persisted through Dr. Strauss's long career at OSU, despite notice to appropriate people, including multiple head coaches, the future Director of Athletic Training, Director of Student Health, and an Athletic Director, who could have and should have taken action.

316.    This pattern of deliberate indifference continued beyond Dr. Strauss's retirement, as evidenced by numerous, persistent reports and allegations of sexual abuse and misconduct across campus that were not properly addressed by the University and permitted the creation of a campus condition rife with sexual assault.

317.    Any policies or procedures in place at OSU during Dr. Strauss's tenure were clearly ineffective and inadequate and essentially served no purpose in protecting students.

318.    Ohio State's delay and deliberate indifference has created a hostile environment for its male students, particularly its male athletes.

319.    OSU's actions and inactions had the systematic effect of depriving Plaintiffs herein and countless other students of the educational benefits afforded to them through their enrollment in the University.

320.    Case in point: it has been four years since OSU was specifically put on notice by the Department of Education that its culture fostered a sexually hostile environment for students, and yet no action has been taken to remedy the abuse suffered by its students, including the victims of Dr. Richard Strauss.

*E. 2018: Public Outcry Compels OSU to Retain Perkins Coie to Investigate Itself*

321.     In April 2018, twenty years after Dr. Strauss's retirement, and forty years after the first complaint of abuse, former student athletes publicly accused OSU of covering-up for Strauss.

322.     To placate the public outcry, OSU hired an independent law firm, Perkins Coie, to investigate who at OSU knew what, and when, about sex abuse by Dr. Strauss against student athletes dating back to the late 1970s.

323.     OSU only began the investigation in an effort to protect its brand, after multiple former students came forward with their stories of abuse by Dr. Strauss, and these stories were publicized in the media.

324.     OSU expressed sympathy for the survivors but did not accept responsibility.

325.     Although many of Dr. Strauss's victims, including Plaintiffs in this case, felt that his exams were medically inappropriate and deeply uncomfortable, many of them did not realize these exams constituted illegal sexual abuse and harassment until after OSU publicized its investigation this year.

326.     Nor did these victims realize the magnitude or scope of Dr. Strauss's abuse of OSU students or OSU's role in permitting Dr. Strauss's rampant sexual misconduct.

327.     And many of Strauss's victims, including the Plaintiffs in this case, were revictimized by the opening of the Perkins Coie investigation in April 2018, having compartmentalized and repressed their memories of abuse for many years.

328.     They have been further revictimized in recounting the horrific details of their abuse to the "independent" investigators OSU is paying to finally look into Dr. Strauss's legacy.

329.     The Perkins Coie investigators are no more than a team of lawyers, paid by OSU to canvas victims and frame the extent of OSU's potential liability.

330. No detailed written statements were taken, and the victims were not provided their written statements for feedback, correction, or follow-up.

331. The "investigation" was not professionally done: victims were not given the choice of male or female interviewers for this sensitive information. The lead investigators were white collar defense investigators, and there is no indication that they were trained in trauma-informed interviewing or counseling.

332. The female interviewers who talked with Plaintiffs and others are not specially trained or certified for interviewing sex abuse victims; for example, one is an e-discovery/document review attorney at Perkins Coie.

333. The "investigation" did not to change the culture at OSU: The victims who reached out to speak with Perkins Coie are not asked about how the OSU system could or should be fixed to prevent what happened for decades.

334. OSU knows who the team members of the various sports were from 1978-2004, and who the male patients in its Clinic were from 1978-2004, but has done nothing to identify where they are now, and contact them—claiming instead it does not want to "re-traumatize" them by bringing up the past. This implies OSU knows it is likely that every male athlete was abused, that the abuse itself was painful, that they have repressed it for decades, and that coping with it will be painful even now.

335. OSU doesn't want to be held accountable for employing a serial, sexual predator, allowing him to abuse students for years, and then failing to take any remedial action to help these students.

336. If OSU had taken meaningful action to address prior reports of Dr. Strauss's sexual abuse forty years ago, Plaintiffs would not have been abused by Dr. Strauss.

337.     Since the allegations became public in early 2018 and OSU opened its investigation, OSU now has ample notice of Dr. Strauss's abuse of its students, including Plaintiffs herein, and yet it has taken no affirmative action to change or improve upon the culture of indifference or help the victims.

338.     Only recently could OSU no longer hide behind its self-made veil of secrecy. With the jig finally up, OSU proclaimed its intent to help the victims heal despite its quiet efforts to kill Plaintiffs' claims along with their spirits.

339.     In this manner, Plaintiffs' claim stems from OSU's deliberate indifference, spawned by Dr. Strauss's barbarism, and OSU's decades-long refusal to own Dr. Strauss's behavior and to make proper amends to his victims. Instead, OSU ignored it, excused, it, and did everything except own up. But still, OSU seeks to evade responsibility. Plaintiffs' amended complaint does not let that happen.

340.     It is time to hold OSU accountable.

341.     Through this lawsuit, Plaintiffs demand that OSU acknowledge its failures, account for and compensate Plaintiffs for the damages these failures have caused, and institute real and meaningful change to ensure that no future OSU students endure such abuse and harassment.

342.     After the filing of the Amended Complaint in this action (Doc. 33), as the Perkins Coie investigation dragged on, Plaintiff Brian Garrett and others who filed suit asked to speak directly with the OSU Board of Trustees to engage in a discussion about what might be done.

343.     The Board granted Mr. Garrett's request, but literally that same day, its attorneys filed a motion to dismiss the survivors' claims.[39]

344.     At the meeting of the OSU Board of Trustees, then-chairman of the OSU Board,

---

[39] Doc. 38.

Mr. Gasser (who subsequently resigned) "told the victims that appeared before the board that, [']rest assured, the board is not dismissing you. We're committed to doing the right thing."[40]

345.    However,    despite    Mr.    Gasser's    assurances    to    victims, OSU sat on its hands, with its motion to dismiss pending, and awaited the findings of Perkins Coie, which wouldn't come for another six (6) months.

346.    The Perkins Report was finally released on May 17, 2019.

347.    On May 24, 2019, Chairman Gasser resigned from the Board.

F.   *2019: Perkins Coie Report Released -- Plaintiffs Discover OSU's Deliberate Indifference to the Sexual Assaults by OSU's Predator Physician*

348.    On May 17, 2019, after more than a year of investigation, the long-awaited Perkins Coie report was finally delivered.

349.    The Report does not whitewash OSU's culpability but is instead an indictment of OSU's repeated failures to escalate/report complaints of sexual abuse or to otherwise take action despite knowledge reaching the upper levels of the University's administration. OSU has not contested, but embraced, its findings—accepting its responsibility for the first time, apologizing to the survivors and the public. Now it must step up and own how it failed these survivors.

350.    The findings made in the Perkins Coie Report confirm the allegations made by Plaintiffs and provide additional insight into the severity of the abuse and the far-reaching implications of OSU's empowerment of Strauss.[41]

---

[40] Transcript of Hrg Jan. 17, 2019, (Doc. 52, at 4: 4-6, 24) (Judge Watson recounting what he heard Mr. Gasser say).

[41] The Report outlines abuse by Strauss of students and student-athletes alike. It focuses on the abuse that occurred on the OSU campus, particularly in Larkins Hall and the student health center and at Strauss's off-campus "Men's Clinic of America." Though outside the purview of the Report's factfinders, it also details abuse by Strauss at medical/clinical trials, sports summer camp for minor children, at churches, high school wrestling tournaments, and in other avenues which he involved himself through his position at OSU—and used to abuse men and children, as young as

351.     Survivors outlined Strauss's *modus operandi* to Perkins investigators and the Report detailed the stark similarities in these stories, described as "both highly credible and cross-corroborative."[42]

352.     Of the 177 survivors interviewed by investigators, 153 were associated with Strauss through his role in the OSU athletics department.[43] In his role as team doctor to several sports, the report confirmed that Strauss was given unfettered access to student-athletes.[44]

353.     A large portion of the Report described the trauma-informed approach employed to interview and fact-find and discusses difficulty in obtaining information from victims because of their profound distrust of institutions like OSU based on the abuse they suffered, "Many, if not most, of the men who contacted us did so with great hesitation."[45]

354.     Those who did cooperate described the *quid pro quo* sexual abuse, the price the athletes had to pay to maintain their scholarships and place on the team. As early as Strauss's first year as team physician in 1979, the OSU Athletic Department and Sports Medicine program had

---

eleven years old. Strauss carried his perversion far and wide, and OSU cloaked him in legitimacy by lending its name and authority to him.

[42] Funk, Markus and Caryn Trombino, Perkins Coie LLP. *Report of the Independent Investigation, Sexual Abuse Committed by Dr. Richard Strauss at The Ohio State University*, May 15, 2019, p. 13. ("With rare exception, we found the survivor accounts concerning their experiences with Strauss to be both highly credible and cross-corroborative. Regardless of whether survivors attended OSU in the late 1970s or in the early 1990s, or whether they were student-athletes on the football team or non-athlete students treated by Strauss in the Student Health Center, their descriptions of Strauss' conduct were remarkably similar. Despite this consistency, the details contained in their individual accounts were unique and did not bear indicia of being "copycat" or coordinated, scripted stories. Adding further credibility, and as explained in this Report, the accounts of abuse were corroborated both by contemporaneous records we located in the Independent Investigation, as well as statements from other Investigation witnesses, including University employees and staff.")

[43] *Id*. at 42.

[44] *Id*. at 34-35.

[45] *Id*. at 13.

direct reports of Strauss's lewd sexual conduct.[46]

355.    His misbehavior was widely discussed within the athletics department, including his proclivity to conduct inappropriately lengthy and unnecessary genital exams, showering with the students, and his loitering in the student's locker room.[47]

356.    As concluded in the Report, these behaviors would continue for almost two more decades.

357.    By November 1994, when OSU's Medical Director/Head Team Physician sent a letter to Senior Associate Athletic Director, addressing "concerns" raised by the head coach for fencing, regarding male fencers' discomfort with Strauss, knowledge of sexual abuse by Strauss was widespread and an "open secret" amongst OSU employees.[48]

358.    However, the Perkins Coie Report outlines how it took another year and half, until June 1996, after three different students reported being assaulted by Strauss in less than a year, before OSU would even initiate action to limit his unfettered contact with students.

359.    The report concludes that even after OSU officials determined that Strauss's conduct was sexually abusive in nature, they allowed him to quietly retire and bestowed him with emeritus status.[49]

360.    The report details that OSU allowed him to lure male students to his "clinic" and repeatedly advertised in the school paper, with the knowledge that he had abused a plethora of male students, ultimately allowing him access to unsuspecting male students in the off-campus

---

[46] *Id*. at 2.

[47] *Id*. at 88.

[48] *Id*. at 92.

[49] *Id*. at 154.

location.[50]

361.     In support of its investigation, Perkins Coie retained two independent doctors to provide input on the medical necessity of all of Strauss's reported "procedures" and examination techniques; the expert physicians found that the reports made by survivors all described medically inappropriate and unnecessary methods—concluding that Strauss's action were all for his own sexual gratification.[51]

362.     Perkins Coie confirmed that *treatments provided for students and student-athletes served no medical purpose or justification, and only served to inflict extreme emotional and psychological trauma on his male patients.*[52]

363.     Many survivors and loved ones of survivors have described an "awakening" experience upon reading the Perkins Coie Report of the Independent Investigation.

364.     For the first time, survivors realized that they had not only been betrayed by Dr. Strauss, but that they were also betrayed by OSU.

365.     Many Plaintiffs herein believed their own instances of abuse by Strauss to be isolated, one-off events. They were too humiliated to disclose the abuse and those that did were shot down, not believed, ignored, or threatened by Strauss. OSU's hush-hush approach and long-term inaction effectively concealed the facts of Strauss's abuse and OSU's role in facilitating that

---

[50] *Id.* at 151.

[51] *Id.* at 12. ("In order to discern whether, and to what extent, Strauss' physical examinations of student-patients exceeded the boundaries of what was appropriate or medically necessary, it was essential for the Investigative Team to consult with suitably qualified medical experts. To that end, Perkins conducted a nationwide search for medical experts who met three essential criteria: (1) no affiliation with The Ohio State University; (2) significant experience serving as team physicians at the intercollegiate level; and (3) ability to speak to the prevailing medical practices applicable during the relevant time period. Ultimately, we retained two eminently qualified external physicians ("External Physicians") with whom we consulted in preparing our factual findings…")

[52] *See generally Id.* at 43-68. (emphasis added)

abuse.

366.    Even if Plaintiffs herein had known that Dr. Strauss's conduct constituted sexual assault, Plaintiffs were not aware of any formal OSU grievance procedure to complain about Dr. Strauss.

367.    Even if Plaintiffs had known that Dr. Strauss's conduct constituted sexual assault and/or had known to complain, or in fact did complain, Plaintiffs had no reason to know the role that OSU had played in facilitating the abuse: OSU received but ignored or rebuffed or concealed complaints against Strauss, which prevented Plaintiffs from discovering their claims against OSU.

368.    Due to OSU ignoring and rebuffing and concealing complaints, any investigation by Plaintiffs would have been futile.

369.    It wasn't until reading news coverage of the OSU investigation in 2018 or the Perkins Coie Report in 2019 that Plaintiffs were certain that Dr. Strauss's conduct was not medically necessary and that it was, in fact, sexual assault.

370.    It wasn't until the Perkins Coie Report was released that Plaintiffs herein realized the magnitude or scope of Dr. Strauss's abuse of OSU students, or OSU's role in permitting Dr. Strauss's rampant sexual misconduct.

371.    It wasn't until the Perkins Report was released that Plaintiffs realized that OSU had knowledge of Strauss's sexual abuse of male students for decades and chose to ignore it.

372.    It wasn't until the Perkins Coie Report was released that Plaintiffs realized that OSU had received repeated complaints about Strauss's prolonged genital examinations and other disturbing sexual proclivities but took no action against him.

373.    It wasn't until the Perkins Coie Report was released that Plaintiffs realized that OSU athletic directors, coaches, trainers, administrators, physicians, executives and deans alike all

knew about reports made by students against Strauss and did nothing.

374.     It wasn't until the Perkins Coie Report was released that Plaintiffs realized that they weren't alone, and that many hundreds of other OSU male students between 1978-1998 had been sexually assaulted, sodomized, penetrated, molested, groped, and emotionally scarred because of OSU's deliberate indifference.

375.     It wasn't until the news coverage of the OSU investigation in 2018 and/or the Perkins Coie Report was released in 2019 and Plaintiffs discovered how OSU failed them that many of them even decided to come forward, identifying themselves as victims **for the first time**—to investigators, to attorneys, to spouses, to family members, and even to themselves.

376.     As one survivor so aptly put it, "Strauss had a type. Naïve." And OSU gave him authority, access, and unfettered opportunity to sexually abuse and exploit as many of these young, naïve students as possible.

377.     The thirty-nine (39) Plaintiffs herein reported being subjected to Strauss's abuse in the following ways:

   a.     Tier 1 (Sodomy/anal intercourse): 1 Plaintiff

   b.     Tier 2 (Oral Sex / Digital Penetration / Masturbation): 13 Plaintiffs

   c.     Tier 3 (Groping / Fondling / Genital Touching) 37 Plaintiffs

   d.     Tier 4 (Abuse without touching (Showering/Exposure/ Voyeurism/ Photography/ Sexual Proposition/Lewd Comments): 37 Plaintiffs

   e.     Unknown/Unreported Sexual Abuse by Strauss: 1 Plaintiff

378.   Over 90% of the Plaintiffs individually represented in this lawsuit were physically sexually molested by Strauss—a staggering statistic that OSU cannot ignore.



379.

380.     What the Perkins Coie Report did whitewash were gruesome and horrifying details of abuse of young men who were sodomized, drugged and preyed upon by Strauss during their most impressionable years, and in their most vulnerable moments – while seeking medical care.

381.     The report goes into detail regarding molestation and clear sexual assault by Strauss, but conspicuously leaves out the stories that still haunt and torment these men today, thirty years later.

382.     Some survivors recount being injected by Strauss by what they believed to be medicine and then waking up, disrobed, with no memory of what had happened to them. What Strauss did to these young men during these dark periods of unconsciousness is what will haunt them for the rest of their lives.

383.     Another survivor was sexually abused by Strauss while he was conscious, but was physically incapacitated and unable to protest or otherwise stop Strauss from assaulting him.

384.     Most horrifying yet, some survivors were anally penetrated by Strauss.

385.     Being sodomized by a University-sanctioned professor and medical doctor is an

unfathomable trauma and Perkins Coie affirmed how prevalent Strauss's abuse of male students was on OSU's campus during his two decades of employment.

386.    Strauss's abuse—which OSU allowed to continue unchecked throughout his long tenure—traumatized many victims for decades. Indeed, some victims continue to be afraid to see doctors to this day, causing them to neglect their health and to receive dangerous diagnoses late.

387.    Although complaints of disturbing sexual assault by Dr. Strauss mounted over the years, OSU took no action. OSU did no further investigation of the above reports. OSU did not impose conditions on his continued employment, such as a chaperoning policy. OSU did not terminate Strauss. OSU did not pass on the above reports to the Ohio Medical Board. OSU did not pass on the above reports to law enforcement.

388.    The most troubling fact revealed by the Perkins Coie Report was the sheer number of OSU employees who had knowledge of complaints against Strauss as far back as 1979.

389.    The Perkins Coie Report ticks through the various OSU departments where Strauss was employed: Student Health, Athletics Department, Medical Center etc. and who, in each department, over the span of his tenure, had knowledge of reports of Strauss's misconduct.

390.    If any one of the dozens of OSU agents with knowledge had taken action, investigated further, escalated the reports to OSU executives or reported to law enforcement, Strauss's reign could have been stopped. But these people, individually and collectively, did nothing.

391.    The Perkins Coie Report is significant in its account of how many people admitted, in 2018-2019, that they knew about Strauss *back then*.

392.    These numbers do not reflect the many other OSU agents with memory lapses, memory blocks, death or disability, or for those who refused to cooperate with Perkins Coie for

Page 55

fear of their own personal liability in allowing Strauss to carry on with his abusive treatment of students.

393.    At least two (2) OSU Athletic Directors received reports about Strauss.

394.    At least two (2) OSU Head Team Physicians received reports about Strauss.

395.    At least six (6) OSU Assistant Athletic Directors received reports about Strauss.

396.    At least five (5) OSU Team Physicians received reports about Strauss.

397.    At least twenty-two (22) OSU Coaches received reports about Strauss.

398.    At least one (1) OSU Athletic Training Director received reports about Strauss.

399.    At least four (4) OSU Athletic Trainers received reports about Strauss.

400.    At least eighteen (18) OSU Student Trainers received reports about Strauss.

401.    At least four (4) OSU Student Health Officials received reports about Strauss.

402.    At least three (3) OSU Student Health employees received reports about Strauss.

403.    An unknown number of other OSU personnel, executives, lawyers, trustees and/or other OSU officials were aware of complaints against Strauss, or at a minimum, had heard rumors about his disturbing conduct while treating male students.

404.    Any one of these individuals, each an agent of OSU, was an appropriate person under the law.

405.    Any one of these individuals was in a position to protect students.

406.    But for two decades, while thousands of unsuspecting students were subjected to rape, sodomy and pervasive sexual molestation, and harassment, OSU took no action to investigate, to intervene, to share, to escalate, to publicize, to remove, to discipline, to report or to otherwise protect students from him.

G. *Following the Release of the Perkins Coie Report, OSU Finally Acts – But Only to Protect Its Brand, Control Public Relations, and Silence Survivors*

407.     Instead of taking accountability for its role in perpetuating the sexual assaults of innocent students, as Perkins Coie confirmed, OSU used the release of the report as an opportunity to gain ground in the court of public opinion, using the media to portray the University as deeply empathetic.

408.     Following the release of these damaging findings, on May 16, 2019, President Drake proclaimed: "It's outrageous that the university fundamentally failed to prevent this abuse decades ago… Ohio State will continue to marshal resources to support survivors and contribute to the national effort of combating sexual misconduct and abuse."

409.     But OSU has not "marshall[ed] resources to support survivors," instead it has asked this Court to dismiss them.

410.     In June of 2019, the parties attended the Court-ordered mediation, which was unsuccessful.

411.     After mediation, on June 27, 2019, OSU again paid lip service to its commitment to Plaintiffs. Chris Davey, Ohio State's Associate VP of University Communications announced: "Richard Strauss' actions are reprehensible, and the university's inaction at the time is unacceptable. ... We are grateful to all those who have come forward to share what happened. We remain deeply concerned for everyone affected by Strauss' actions, and the university remains firmly committed to the mediation process outlined by the federal court."

412.     Desperate to make a good public show, OSU made another typical pronouncement that it was "grateful" for the victims coming forward, "deeply concerned" about them, and "firmly committed to the mediation process"—but instead OSU continues to hang its hat on its statute of limitations argument, seeking to extinguish Plaintiffs claims.

413.     Davey's quote came on the heels of testimony earlier that day, by five brave

Strauss survivors, all Plaintiffs herein, who recounted the gruesome and disturbing details of their abuse to the Ohio House Civil Justice Committee. The troubling recollections by these men could be felt by every soul in the statehouse that day and every person who watched from afar.

414. Even OSU could not deny that what was expressed by these victims was profoundly upsetting… but yet OSU seeks to dismiss the victims in this Court as if they never existed.

415. What is contained in the Perkins Coie report is just a small smattering of the evidence which imputes liability on OSU for the years of abuse by Strauss.

416. For example, the report determined that Dr. Strauss abused at least one-hundred and seventy-seven (177) victims during his time at OSU.

417. In reality, this number is far-greater, as evidenced by the filing of this lawsuit and several others, on behalf of at least 300 victims. The numbers don't lie. These men were repeatedly sexually abused by Strauss at different times, in different manners.

418. The damage resulting from OSU's failure to remove Strauss is overwhelming, and the details of the abuse and OSU's coverup of the abuse are still coming to light today and his victims begin to understand OSU's role in what they suffered silently for all these years.

419. On October 1, 2019, OSU released crime statistics for reports made on campus and in properties adjacent to campus, pursuant to the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act (the "Clery Act Report")—and the results were staggering.

420. For the first time, OSU confirmed reports of **1,429 instances of fondling and 47 instances of rape attributable to Strauss.**[53]

---

[53] *University issues annual crime report*, October 1, 2019, https://news.osu.edu/university-issues-

421. The numbers published in the 2019 Clery Act Report demonstrate that Perkins Coie's Report is limited and nonconclusive—and suggest that many more than 177 victims suffered at the hands of Richard Strauss.

422. OSU used the release of these findings as an opportunity to give lip-service support to survivors and their loved ones. President Drake e-mailed OSU alumni and former student-athletes more meaningless proclamations: "Strauss' actions and the university's inaction at the time were unacceptable. I want to reiterate our profound regret and sincere apologies to each person who endured Strauss' abuse — and our gratitude for the strength and courage of all who shared their experiences."[54]

423. But these are merely words and not action: OSU's gratitude for the strength and courage of all who shared their experiences remains to be seen.

424. Indeed, consistent with its two-faced approach, OSU has remained loyal to its commitment to dismissing Plaintiffs' claims under Ohio's current two-year statute of limitations.

425. These naïve men arrived on campus in Columbus, inspired by the next four years ahead of them at a University they loved. Strauss took their innocence, and OSU betrayed them. The conduct of the University and its doctor forever changed their lives.

426. Survivors are still paying for what Strauss did to them as OSU students—what OSU authorized him to do.

427. Many of them suffered humiliation, depression, dropped out of school, received failing grades or quit their sports team and relinquished their athletic scholarships—all to escape

---

annual-crime-report/ (last visited October 10, 2019)

[54] The Ohio State University, Office of the President, *A Message from President Drake: Strauss Investigation Update*, October 1, 2019, https://president.osu.edu/presidents/drake/news-and-notes/2019/a-message-from-president-drake-strauss-investigation-update-oct-2019.html (last visited October 10, 2019)

Strauss and the university that allowed him to prey on them. In turn, they had their livelihoods stolen as well.

428.    For many of them, the entire trajectory of their life was altered.

429.    Reading the Perkins Coie Report, which put each Plaintiff's personal experience of abuse in context with the many many who suffered, over many many years and with so much awareness by many in university leadership, connected all the dots for these Plaintiffs and put in sharp focus, for the first time, the role that OSU played: Not only were these men victims of Strauss, they are victims of OSU's failed policies and deliberate indifference.

### H. High-Ranking Ohioans Step Up to Call Out OSU's Institutional Failures that Left Students Susceptible to Strauss

430.    Following the public outcry as details emerged implicating OSU as Strauss's protector, as OSU continued to hide behind the Statute of Limitations defense, on May 16, 2019, Ohio state Representative Brett Hillyer introduced House Bill 249 ("HB 249"), a bill which proposed removing the statute of limitations for Strauss victims to pursue their civil claims against OSU.

431.    Support for HB 249 was swift and overwhelming.

432.    Republicans and Democrats alike, across Ohio and across America, have spoken out in favor of the bill, which gives these victims their long-awaited day in court, to hold OSU accountable for protecting and covering-up for Strauss all these years.

433.    Numerous Strauss survivors and their families have heroically testified, sharing their stories of abuse to the Ohio legislature and constituents. Following these public hearings, the outpouring of love from the public has been immense.

434.    As Ohioans back the proposed legislation, Ohio Governor Michael DeWine has

repeatedly expressed his unwavering support for abolishing the statute of limitations for sexual abuse victims.[55]

435.    Governor DeWine unequivocally stated: "We can use this tragedy as an opportunity to review Ohio's current laws and to take steps to change the culture of how we respond to sexual abuse".[56]

436.    On May 20, 2019, Governor DeWine further showed support for Plaintiffs by signing an executive order, appointing a task force to investigate the actions taken by the State Medical Board, which heeded reports about Strauss in the 1990s and failed to take away his medical license, as uncovered by Perkins Coie's report.

437.    The findings of the task force only confirmed that OSU had numerous credible reports by Strauss's patients for years.[57]

438.    Support for HB 249 has even come from OSU's campus—on October 23, 2019, the OSU Student Government's General Assembly unanimously voted to pass a resolution calling on OSU to support HB 249 and to "stand with OSU survivors past, present, and future".[58]

439.    One student Senator, Ose Arheghan, aptly expressed his feelings on why OSU refuses to support HB 249, "Ohio State University has a huge financial interest in avoiding the passage of this bill," Arheghan said, adding that he felt that OSU and its legal counsel were

---

[55] Jeremy Pelzer, *Gov. Mike DeWine: End statute of limitations for rape in wake of Ohio State sex abuse report*, May 20, 2019. https://www.cleveland.com/open/2019/05/gov-mike-dewine-end-statute-of-limitations-for-rape-in-wake-of-ohio-state-sex-abuse-report.html (last visited November 4, 2019)

[56] *Id.*

[57] *See generally Governor's Working Group on Reviewing the Medical Board's Handling of the Investigation Involving Richard Strauss*, Ohio Department of Public Safety, August 30, 2019

[58] Sam Raudins and Owen Conn, *USG Calls on University to Support Strauss Bill,* The Lantern, Oct. 23, 2019,  https://www.thelantern.com/2019/10/usg-calls-on-university-to-support-strauss-bill/. (last visited November 4, 2019)

pressuring the Ohio legislature to stall the bill.[59]

440. Right on cue, OSU responded to the students' passage of the resolution and University spokesman Ben Johnson doled out one of OSU's canned responses.

441. "For more than a year, Ohio State has led the effort to investigate and expose the misdeeds of Richard Strauss and the systemic failures to respond, and the university is committed to a fair resolution," Johnson said. "The university is actively participating in good faith in the mediation process directed by the federal court."[60]

442. Five days later, on October 28, 2019, the parties attended their second mediation session, which did not result in settlement.

443. On November 19, 2019, Ohio House Speaker Larry Householder said he'd like to see OSU "do the right thing" for Strauss's victims, and admonished OSU that there is no "advantage to the university waiting" and the Ohio legislature "wish[es] Ohio State would step up and take care of their obligation."[61]

444. Two days later, on November 21, 2019, after hearing from three Plaintiffs named herein, Brian Garrett, Dan Ritchie and Mike Schyck, the chairman of the OSU Board of Trustees echoed OSU's sentiments from the last year and a half, stating "I want to reiterate that we are dedicated to a fair outcome."[62]

_____

[59] *Id.*

[60] *Id.*

[61] *House Speaker to Ohio State: Do the Right Thing For Victims of Team Doctor*, Dayton Daily News, Nov. 19, 2019, available at https://www.daytondailynews.com/news/crime--law/house-speaker-ohio-state-the-right-thing-for-victims-team-doctor/P4aL2hBmsooYlGZAVLLjKL/(last visited Nov. 21, 2019).

[62] Jennifer Smola, *Strauss Victims Ask Ohio State to Not Let Them Down Again,* The Columbus Dispatch, November 21, 2019, available at https://www.dispatch.com/news/20191121/strauss-victims-ask-ohio-state-to-not-let-them-down-again (last visited November 25, 2019)

445.     The victims of Dr. Richard Strauss still wait for the day that OSU's actions mirror the words. They still await OSU taking accountability for employing and emboldening a serial sexual abuser for nearly two decades and then subsequently covering up the University's role in perpetuating the abuse for another two decades.

## CLASS ACTION ALLEGATIONS

446.     Plaintiffs bring this action individually and pursuant to Federal Rule of Civil Procedure 23 (b)(3) or (c)(4) on behalf of themselves and the following

"Nationwide Class":

All male students, student athletes, invitees, and alumni who (1) were examined by or interacted with or endured any contact with Dr. Richard Strauss from 1978-1998 or (2) participated in a varsity athletic sport that utilized the locker rooms, showers, and/or saunas at Larkins Hall at any time between 1978 and 1998. Excluded from the class are (1) individuals who have already filed suit in Case No(s). 18-cv-0736, 19-cv-4902 as of the date of this Complaint.

447.     The Classes consist of hundreds, if not thousands, of men throughout the United States, making joinder impracticable, in satisfaction of Fed. R. Civ. P. 23(a)(1). The exact size of the Class and the identities of the individual members are ascertainable through records maintained by the Ohio State.

448.     The claims of Plaintiffs are typical of the Classes. The claims of the Plaintiffs and the Classes are based on the same legal theories and arise from the same factual pattern involving the Defendant's misconduct.

449.     There are many questions of law and fact common to the claims of Plaintiffs and the Class, and those questions predominate over any questions that may affect only individual Class members within the meaning of Fed. R. Civ. P. 23(a)(2), (b)(3), and (c)(4).

450.     Common questions of fact or common questions of law affecting members of the Class include, but are not limited to, the following:

a.  Whether Defendant violated Title IX of 20 U.S.C. §1681?

b.  Whether Defendant displayed deliberate indifference to the sexual abuse, assaults, and discrimination at Ohio State?

c.  Whether Defendant had knowledge or knew that Richard Strauss was engaging in sexual abuse of Ohio State's male students and student-athletes?

d.  Whether Defendant concealed, dismissed, discouraged or rebuffed complaints that, if handled reasonably and timely (and in compliance with Title IX) would have prevented future abuse?

e.  Whether Plaintiffs were damaged by the violations caused by Defendants?

451.   Absent a class action, most of the members of the Class would find the cost of litigating their claims to be prohibitive and would have no effective remedy. The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation, particularly as to liability, in that it conserves the resources of the courts and the litigants and promotes the consistency and efficiency of adjudication.

452.   Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs have retained counsel with substantial experience in prosecuting complex litigation and class actions, and who have expertise in prosecuting personal injury, sexual abuse, and civil rights cases on behalf of vulnerable victims.

453.   Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the other Class members, and they have the financial resources and experience in handling sex abuse cases to do so.

454.   Neither Plaintiffs nor their counsel have any interests adverse to those of the other members of the Class.

455.   Plaintiffs and the Class will have personal injury damages that are individualized and that can be managed separately.

## CLAIM FOR RELIEF

### Violation of Title IX, 20 U.S.C. § 1681, *et seq*

456.    Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

457.    Title IX, 20 U.S.C. § 1681(a), states: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance…."

458.    Title IX also protects third parties from sexual harassment or violence in a school's education programs and activities.

459.    Under Title IX, sexual harassment is any type of unwelcome conduct of a sexual nature and "includes unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature."

460.    Plaintiffs are "persons" within the meaning of 20 U.S.C. §1681(a).

461.    Defendant OSU receives federal financial assistance and is therefore subject to the provisions of Title IX of the Education Act of 1972, 20 U.S.C. §1681, et seq.

462.    As the U.S. Department of Education's Office of Civil Rights has explained, Title IX covers all programs of a school, and extends to sexual harassment and assault by employees, students, and third parties.

463.    Dr. Strauss's actions and conduct were carried out in his capacity as a team doctor and assistant medical professor of OSU or otherwise as an employee or agent of the University, and/or in the context of OSU programs or activities.

464.    Dr. Strauss's sexual assault, battery, molestation, and harassment of Plaintiffs, including the fondling of testicles, fondling and masturbation of penises, nonconsensual digital

anal penetration, and lewd and voyeuristic harassment in communal showers, was sexual discrimination and sexual harassment under Title IX.

465. Pursuant to Title IX, Defendant OSU was obligated and required to investigate all allegations of sexual assault, battery, molestation, and harassment, including allegations that sexual assault, battery, molestation, and harassment has been committed by an employee, student, or third party.

466. Defendant OSU owed Plaintiffs duties under Title IX, which duties included not to engage in and be deliberately indifferent to known sexual assault, battery, molestation, harassment, or any other form of sexual misconduct.

467. An "appropriate person" of OSU, within the meaning of Title IX, including but not limited to, former Athletic Director and Assistant University Vice President Andy Geiger, former Athletic Director Jim Jones, former OSU medical director Dr. John Lombardo, former OSU Vice President David Williams, former student health director Dr. Forrest Smith, OSU doctor and co-author of studies with Strauss, former OSU student health physician Dr. Roger Miller, former OSU tennis team physician Dr. Trent Sickles, former head wrestling coach Russell Hellickson, former head tennis coach John Daly, Director of Student Health Ted Grace, M.D., former assistant athletic trainer Bill Davis (later Director of Athletic Training at OSU), current university president Dr. Michael Drake, and other OSU faculty, staff, administrators, executives and officials (over the course of forty years) had actual and/or constructive notice of sexual assault, battery, molestation, and harassment committed by Dr. Strauss and the other sexual predators as described herein this Complaint.

468. Thus, the complaints of sexual abuse at Ohio State involving Dr. Strauss were not left unreported at the level of athletes and assistant coaches. Rather, the rampant sexual abuse and culture of sexual abuse was reported to head coaches of multiple sports, Ohio State

administrators and to the head of the Athletic Department. But these officials turned a blind eye to the abuse.

469.    Former wrestling head coach, Russell Hellickson, has publicly stated in 2018 that it was widely known that Dr. Strauss was engaging in improper sexual behavior and that he reported this behavior to higher authorities within OSU, but OSU authorities did nothing.

470.    OSU could have prevented Plaintiffs' abuse had OSU taken appropriate and reasonable action on prior complaints about Strauss's conduct.

471.    OSU created a sexually hostile culture in its athletic and student health programs, which substantially heightened the risk that Plaintiffs and others would be sexually harassed and/or assaulted.

472.    OSU has failed and continues to fail to carry out its duties to investigate and take corrective action, or to make appropriate recommendations, under Title IX following the complaints of sexual assault, as described herein.

473.    Despite the complaints and concerns conveyed by athletes and coaches to Defendant OSU and its agents and/or representatives, as described herein, sexual abuse and misconduct allegations went unaddressed, which violated reporting policies and procedures and Title IX and was done in a manner that displayed deliberate indifference to the sexual misconduct and abuse that was occurring.

474.    The sheer scale of the abuse (involving nonathletes and student athletes from at least 14 sports) multiplied by the years it went on for (nearly 20 years) makes it implausible to suggest that Defendant OSU (through its agents and/or representatives) did not know of the endemic sexual abuse.

475.    The Perkins Coie Report independently confirms this and explicitly names those at OSU who were aware of the abuse throughout Strauss's twenty-year tenure.

476.    The Clery Act Report released by OSU on October 1, 2019, independently confirms the magnitude of abuse.

477.    OSU acted with deliberate indifference by failing to respond to the allegations of sexual assault, abuse, and molestation in light of the known circumstances, Dr. Strauss's conduct toward male athletes, and the scale of the abuse, which occurred both in private examination rooms and also publicly in the showers and training facilities by Dr. Strauss and the other sexual predators allowed to roam freely within Larkins Hall.

478.    OSU failed to adequately supervise or otherwise ensure Dr. Strauss complied with Title IX and other state and federal laws even though OSU had gained actual knowledge that Dr. Strauss posed a substantial risk of additional sexual abuse of male students and student-athletes.

479.    OSU's deliberate indifference before, during, and after the sexual assault, battery, molestation, and harassment of Plaintiffs was in violation of Title IX, 20 U.S.C. § 1681, et seq., and its regulations.

480.    OSU's failure to properly and appropriately investigate and take corrective action for the complaints of Dr. Strauss's and other sexual predators' sexual assault, battery, molestation, and harassment resulted in Plaintiffs being subject to further sexual assault, battery, molestation, harassment, and a sexually hostile environment.

481.    OSU's failure to promptly and appropriately investigate and remedy and respond to the sexual assaults after receiving notice subjected Plaintiffs to further sexual assault, battery, molestation, harassment, and a sexually hostile environment, effectively denying them access to educational opportunities at OSU, including appropriate medical care.

482.    OSU's failure to promptly and appropriately investigate and remedy and respond to the sexual assaults after receiving notice subjects Plaintiffs to harm and suffering today.

483.     Prior to the release of the Perkins Coie Report, OSU repeatedly failed to offer counseling services to current or former victims of Dr. Strauss, including Plaintiffs.

484.     As the Perkins Coie Report independently verifies, multiple appropriate persons at OSU knew of the sexual abuse of students by Richard Strauss, they were deliberately indifferent to the abuse, and Plaintiffs were sexually abused as a result of OSU's indifference. These are facts, not legal conclusions.

485.     As a direct and proximate result of the OSU's actions and inactions, Plaintiffs have suffered and continue to suffer pain of mind and body, mental anguish, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self- esteem, disgrace, fright, grief, humiliation, enjoyment of life, were prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life, have sustained and continue to sustain loss of earning and loss of earning capacity, and have incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

486.     In subjecting Plaintiffs and the Class members to the wrongful treatment herein described, and through its violations of Title IX, OSU, in its effort to "save face" and avoid bad publicity, acted willfully and maliciously with the intent to harm Plaintiff and the Class members, and in conscious disregard of Plaintiff and the Class members' rights, so as to constitute malice and oppression. Plaintiff and the Class members are therefore entitled to the recovery of punitive damages, in an amount to be determined by the court, against OSU, in a sum to be shown according to proof.

487.     Furthermore, Plaintiffs request the award of attorneys' fees pursuant to 42 U.S.C. § 1988.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiffs respectfully requests that this Court will:

a.      Enter judgment against Defendant in such amounts as will fully and adequately compensate Plaintiffs for the damages they have suffered, in an amount to be determined at trial;

b.      Award Plaintiffs punitive damages against Defendants in an amount to be determined by a jury for Defendant's violations of federal law;

c.      Award Plaintiffs pre-judgment and post-judgment interest;

d.      Award Plaintiffs their actual expenses of litigation, including reasonable attorney's fees;

e.      Appoint Plaintiffs as class representatives;

f.      Appoint Plaintiffs' counsel as counsel for the Class; and

g.      Award Plaintiffs such other and further relief as the Court deems just and proper.

Respectfully Submitted,

/s/ *Simina Vourlis*
Simina Vourlis,
The Law Office of Simina Vourlis
856 Pullman Way
Columbus, OH 43212
(614) 487-5900
(614) 487-5901 fax
svourlis@vourlislaw.com

Rex A. Sharp
Ryan C. Hudson
Larkin Walsh
Sarah T. Bradshaw
REX. A. SHARP, P.A.
5301 W. 75th Street
Prairie Village, KS 66208
(913) 901-0505

(913) 901-0419 fax
rsharp@midwest-law.com
rhudson@midwest-law.com
lwalsh@midwest-law.com
sbradshaw@midwest-law.com

Robert Allard
CORSIGLIA, MCMAHON AND ALLARD, LLP
96 North Third Street, Suite 620
San Jose, CA 95112
(408) 289-1417
(408) 289-8127 fax
rallard@cmalaw.net

Stephen Estey
ESTEY & BOMBERGER LLP
2869 India Street
San Diego, CA 92103
619-295-0035
619-295-0172 fax
steve@estey-bomberger.com

Daniel R. Karon (#0069304)
KARON LLC
700 W. St. Clair Ave., Suite 200
Cleveland, OH 44113
Tel.: 216.622.1851
dkaron@karonllc.com

Joseph Sauder
SAUDER SCHELKOPF LLC
555 Lancaster Avenue
Berwyn, PA 19312
(610) 200-0580
(610) 421-1326
jgs@sstriallawyers.com

***COUNSEL FOR PLAINTIFFS***

## <u>CERTIFICATE OF SERVICE</u>

It is hereby certified that a true and correct copy of the foregoing document was filed and

served, via the Court's CM/ECF system on November 27, 2019, on all counsel of record.


By:     */s/ Simina Vourlis*
Attorney for Plaintiffs